STATE OF CONNECTICUT *v.* ROY F. DARWIN

KING, C. J., ALCORN, THIM, RYAN and COVELLO, Js.

Argued February 14—decided May 31, 1967

*John F. Shea, Jr.,* with whom was *W. David Keith,* for the appellant (defendant).

*Etalo G. Gnutti,* special state's attorney, with whom, on the brief, was *Joel H. Reed II,* state's attorney, for the appellee (state).

## I

KING, C. J.  A few minutes before 8 o'clock in the evening of Wednesday, September 18, 1963, Hope Fern Rothwell, a girl of seventeen, left her

home in Bolton to attend a meeting of the Tolland County 4-H club committee which was held in the Tolland Agricultural Center building, hereinafter referred to as the TAC building, in Vernon. She drove from Bolton in her mother's green Mercury automobile. The meeting was attended by six women, including Hope, and six men, including the defendant. It broke up at about 10:45 p.m.

A little before 11 o'clock, when Hope had not returned home, her mother telephoned to the TAC building but received no answer. About one-half hour later, Hope's father and mother left the home to look for her. They drove over Reservoir Road, which was Hope's usual route to the TAC building, and came upon the Mercury car which Hope had been driving. The ignition key was still in the switch, and the car was standing near the center of the road, headed toward Bolton. In a plastic bag in the car were yarn, knitting needles and a partially knitted sweater which Hope had started.

About five minutes before the Rothwells arrived at the scene, John Marshall, a Vernon police officer, had come upon the Mercury and had called headquarters for a listing of its registration. While he was waiting for a reply, a southbound car, headed toward Bolton, came along and blinked its lights. It did not stop, and it does not appear that Marshall thought to take its registration or otherwise to attempt to identify it.

No trace of Hope was found until the afternoon of Sunday, September 22, when her body was found in a gravel pit on Dockerel Road in the town of Vernon. Near her body were her handbag and the strap which had been detached from it. An autopsy established that death had been caused by mechanical strangulation, and a mark on her throat corre-

sponded to the width of the strap. There was blood on the body and on the ground beside it.

Obviously Hope had been murdered, and the investigation of the crime was directed toward ascertaining the identity of the murderer. The probabilities were strong (1) that the murderer knew that Hope would be driving home alone from the meeting and that he knew her customary route, and (2) that he was known to her and had murdered her to avoid identification. Although the finding fails to mention the matter, the defendant, in his statement of facts in his brief, states that the autopsy did not indicate that she had been raped, and this appears to be correct. But seminal stains were found, on analysis by Dr. Abraham Stolman, the state toxicologist, on her undergarments. This clearly pointed to some sort of sexually motivated assault. All this evidence caused the investigation to include the men who were present at the 4-H club meeting. In the beginning the defendant, Roy F. Darwin, appeared cooperative.

Prior to the entry of the state police into the case, and after looking in vain for Hope, Mrs. Rothwell, beginning about midnight on September 18, in an endeavor to obtain information about her missing daughter, telephoned some of the persons she believed had attended the 4-H club meeting. She finally returned home about 1:30 a.m. and called Darwin just before 2 o'clock in the morning, but the telephone was not answered. She called again about 2:15 a.m., and Darwin answered. He told her that he had arrived home about 11:25 p.m., that he thought he saw two cars on the road, that the front car was green (the color of the Mercury), and that he thought he saw a man in the front car, which seemed more toward the side of the road than the

rear car, which he thought was brownish and not a police car. About 2:30 in the morning, Officer Marshall telephoned Darwin, who told him about his talk with Mrs. Rothwell, about the brownish car, and that the reason he did not stop was that he had no flashlight. Actually he did have a flashlight with him that night. Darwin then questioned Marshall rather searchingly about his police cruiser and was told about its taillights, that it was black with a white top, and that it had a red light. Darwin told Marshall that he saw someone in the first car who appeared large and to be wearing a hat. Except for the passing car which blinked its lights, the first ones on the scene after Marshall arrived were Hope's father and mother. About 5 o'clock in the morning of September 19, Darwin called Mrs. Rothwell and told her that, on thinking it over, he thought the color of the rear car had been black rather than brown. Samuel S. Rome, a major in the Connecticut state police, testified that on September 23, Darwin said he thought he had gotten the color of the car brown instead of black because of the brown color of the coffee he had been drinking the night of the 4-H club meeting.

Darwin was first approached by the state police on Thursday morning, September 19, when he was asked, by two officers, about the cars he had observed on his way home over Reservoir Road, and he voluntarily accompanied them to the place where Hope's car had been found. On Saturday, September 21, at his home, Darwin gave a written statement and made a sketch of the cars he had seen where Hope's car was discovered. On Monday, September 23, upon request, he voluntarily went to state police headquarters in Hartford and took a lie-detector test given by Sergeant Robert Reimer.

On that occasion, Darwin told Sgt. Reimer that he had learned from reading The Hartford Courant and The Springfield Union that Hope's body had been found in some bushes. Although it was correct that the body had been found in a brushy area, that fact had not appeared in either of those two newspapers. Darwin also told Sgt. Reimer that he had never spoken to Hope before the meeting of September 18, but at a later date he told him that he had spoken to her two or three times before. From Hartford, Darwin went to the Vernon police headquarters, where he first talked with Major Rome. Darwin went home for dinner, and that evening two officers came to his home and requested that he and his wife return to Vernon for further talk with Major Rome. This they agreed to do, and did.

That evening, Darwin voluntarily turned over to the police the clothing which he claimed to have worn on the night in question, consisting of a pair of black shoes, a black tie, a pair of gray trousers and a white shirt. He also told them that he had driven his wife's Chevrolet to and from the 4-H club meeting, and this car was then visually examined by the police.

On October 8, Major Rome told Darwin that he had failed the lie-detector test and suggested that he take another, which he voluntarily did that same day. On October 10, Darwin was asked to take a sodium-amytal test, which he consented to do. This test was given by Dr. Marshall Smith. Prior to this test, Dr. Smith was told by Darwin that, because of his strong, German mind, strength of character and personality, no medication or anything else could effectively change his mind. On occasions prior to his arrest, Darwin had said substantially the same thing to Major Rome. Just before the

test, a police officer, dressed as a "bum", told Darwin that he had seen a woman in a car with Darwin on Reservoir Road on the night in question. This statement was untrue, but it accomplished nothing since Darwin denied the truth of the statement. After the test, which the finding does not indicate was productive of anything, Darwin had black coffee, did not feel well and was taken from Vernon to the Stafford barracks and then home. On the way home from Stafford, he was nauseated, and the car had to be stopped. The next day he was unable to go to work. On October 10, Major Rome doubled the number of state police officers assigned to the case and, with the acquiescence of Mrs. Darwin, started checking the neighborhood for information on Darwin. Darwin was also placed under surveillance in order that the police might know his whereabouts at all times.

Several weeks later, Major Rome visited Darwin's place of employment and asked Darwin to go with him, but Darwin refused, claiming he had been deceived as to the purpose of the sodium-amytal test. Rome then went to Willimantic, where Mrs. Darwin was employed, and she, too, refused to discuss the matter at that time.

Laboratory tests of the clothing which Darwin had turned over to the police as having been worn by him on the night in question disclosed seminal stains on the inside lower portion of the fly of his trousers and a human bloodstain on his white shirt.

On November 27, 1963, after receipt of the results of these tests and those made of Hope's undergarments, Bernard J. Ackerman, the coroner for Tolland County, commenced an inquest into Hope's death. At that hearing, seven witnesses were interrogated, and the hearing was resumed on Decem-

ber 4, when six more witnesses were heard. It was continued to the next day, December 5. Darwin was subpoenaed as a witness at the December 5 hearing and appeared, accompanied by his present counsel. His attorneys were allowed to be with him at the hearing and also to advise him and caution him respecting his rights. Under this guidance of counsel, Darwin testified as a witness before the coroner. Major Rome was present at the hearing and met Darwin's attorneys. The inquest was not completed on that day but was continued rather than adjourned. On the morning of the next day, December 6, Coroner Ackerman issued a warrant for Darwin's arrest. This warrant was given to Major Rome, who went to Darwin's place of employment about 9 o'clock in the morning to serve it. Coroner Ackerman had refused Major Rome's request for a coroner's warrant when it was first made prior to the commencement of the coroner's inquest. The coroner's arrest warrant was issued on December 6 because the coroner felt that there was a strong probability, based on the evidence under oath which had been adduced at the inquest, that Darwin was the man criminally responsible for Hope's death.

With this rather lengthy background statement, we come to the claims of error in this case. Further facts, specifically applicable to these claims, will be given to the extent necessary for an understanding of the opinion.

## II

We now consider certain claims raised at the trial, attacking the legality of Darwin's detention under the coroner's warrant and under a bench warrant.

## (a)

The first claim attacks the validity, in the light of § 54-1b of the General Statutes, of Darwin's arrest and detention under the coroner's warrant.

Darwin was arrested under that warrant at about 9:40 in the morning of Friday, December 6, 1963, at his place of employment. General Statutes § 54-1b as it stood in 1963 (Public Acts 1963, No. 126 § 1) required that Darwin be "presented before the circuit court session next held in the circuit where the offense is alleged to have been committed". There is no real dispute that the Circuit Court convened at 10 o'clock in the morning of that day, and that there was no session of the Circuit Court on Saturday, December 7, or Sunday, December 8. Section 54-1c of the General Statutes as it stood in 1963 provided that "[a]ny admission, confession or statement, written or oral, obtained from an accused person who has not been so presented to the first session of the [circuit] court . . . shall be inadmissible". Public Acts 1963, No. 126 § 3. Of course if the arrest was illegal, it was necessarily unreasonable and would fall within the proscription of the fourth amendment to the United States constitution as made applicable to the states by the fourteenth amendment. *State* v. *Collins,* 150 Conn. 488, 492, 191 A.2d 253.

It is Darwin's claim that, since the December 6 session of the Circuit Court had not yet opened at the moment of arrest, that session was the session "next held" and was the "first session" within the meaning of the foregoing statutes. Under such a construction, if an arrest were made at 9:55 a.m., the arrested person would be required to be brought before the Circuit Court on that day even if, for lack

of business or otherwise, the court session lasted only five minutes. Such an absurd result should be avoided if the language of the statute permits a reasonable construction. We think the trial court correctly held that the term "next session" of the Circuit Court referred to the regular session of the Circuit Court next to be held, excluding any session on the day on which the arrest was made. In this case, Darwin was required, under the statute, to be presented to the Circuit Court, after the arrest under the coroner's warrant, not later than Monday, December 9. We therefore find no merit in this claim of an illegal detention under the coroner's warrant.

## (b)

Darwin also attacks the validity of his arrest and detention, in the light of § 54-43 of the General Statutes, under a bench warrant. Darwin was arrested under a bench warrant at about 12:50 p.m. on Sunday, December 8. Thereupon the coroner's warrant dropped out of the case and was superseded by the bench warrant. The bench warrant had not been given to the police for service until about 10:40 on Sunday morning. Darwin was arraigned before the assistant clerk of the Superior Court at 2 o'clock in the afternoon of the same Sunday. The bench warrant had not been obtained by the state's attorney until the evening of Saturday, December 7. Section 54-43 of the General Statutes provides, as it did in 1963, for the arraignment "forthwith" after an arrest under a bench warrant. There was a lapse of about one hour and ten minutes between the arrest under the bench warrant and the presentation for arraignment before the assistant clerk of the Superior Court at 2 p.m. It is difficult to

envision more faithful compliance with the terms of the statute under the circumstances, particularly if it is kept in mind that the arrest was made on a Sunday.

Darwin seems to claim that there was an unreasonable delay in the service of the bench warrant. Since arraignment was contemplated that very day, when of course the clerk's office was not open, it was necessary to attempt to make arrangements to have the clerk or assistant clerk present in the clerk's office at Rockville on that Sunday. The assistant clerk, who lived in Rockville, was in church when the first attempt was made to get in touch with her. It was nearly 1 p.m. when she was finally reached, and the arraignment was definitely fixed for 2 o'clock that afternoon. In the light of the statutory requirement of "forthwith" arraignment, there might have been a question as to the legality of the arrest had it been made before it had been ascertained that "forthwith" arraignment was possible on the holiday, or had it subsequently developed that it was impossible to have arraignment on that Sunday.

The statute requires arraignment "forthwith" after arrest. It does not require arrest "forthwith" after the issuance of the bench warrant. Darwin attempts to construe the statute as requiring an arrest "forthwith" upon issuance of the bench warrant. It is true that upon its issuance a bench warrant should be served within a reasonable time, under the particular circumstances. *State* v. *Hodge,* 153 Conn. 564, 568, 219 A.2d 367. But if a bench warrant were issued for the arrest of a person not already confined, obviously that person could not vitiate the bench warrant by the simple expedient of eluding the police over an extended period of time, even though by so doing he would have suc-

cessfully prevented arrest under the bench warrant over the same period of time. Under all the circumstances, there is no justification for Darwin's claim that there was an unreasonable delay in the service of the bench warrant.

Nor does the mere fact that time was afforded for the partial reenactment of the crime on Sunday morning prior to the service of the bench warrant, or the subsequent confession after service of the bench warrant but a few moments before the time fixed for the arraignment, alter our determination that there was no illegality in the service of the bench warrant.

### III

Darwin attacks the admission into evidence of certain articles seized by virtue of a search warrant issued by a judge of the Superior Court about a week before the commencement of the trial. The search warrant was applied for under oath by the state's attorney for Tolland County, and both the application and the warrant, which was issued the same day, are printed in full in the record. On the same date the articles described in the warrant were seized. These were (1) the 1955 Chevrolet, which Darwin had admitted at the outset of the investigation, on September 23, that he had been driving on the night of September 18 and which the police had then and there visually examined, and (2) two flashlights. It will be recalled that Darwin had originally denied that he had any flashlight with him on the night in question and that he gave his lack of any flashlight as his excuse for not stopping when, as he claimed, he had come upon the two standing cars on his way home over Reservoir Road on the night of September 18.

Upon seizure of the Chevrolet, the front-seat cushion was taken out and delivered to Dr. Stolman, who tested a stain on it and found it was made by human blood. The interior of the car was vacuumed, and the dust and debris thus gathered were also examined by Dr. Stolman and were found to contain some hair. The finding does not disclose any test of the hair, as such.

Darwin claims that these items were inadmissible as the so-called "fruits of a poisonous tree". To understand this claim, some further facts are essential.

When Darwin was arrested under the coroner's warrant, he was first taken to his home in Andover. In a few minutes the coroner arrived and told Darwin that his house was to be searched by virtue of the coroner's statutory powers. Darwin told the coroner that the door was open but to beware of the dog. Darwin's permission for the search was not sought, and the coroner was acting under § 6-70 of the General Statutes, as amended by Public Acts 1963, No. 642 § 4. The coroner authorized the state police to search the house on his behalf and as his agents. When Mrs. Darwin returned to the house in the early afternoon, she found ten or twelve state troopers on the premises and asked them if they had a search warrant. They replied in the affirmative but showed no warrant and in fact had none except as they had received oral instructions from the coroner to make the search. The house was in a state of confusion or disarray as a result of the search by the troopers, and later that afternoon the troopers returned a Plymouth car, apparently owned by Darwin himself, and also the Chevrolet, together with an inventory of the other articles taken. A little before 7 o'clock in the evening of

the next day, December 7, the coroner and two members of the state police again arrived at the Darwin home. Mrs. Darwin again asked them if they had a search warrant and was told that none was necessary since they were going to search the house as the coroner's agents and at his direction. Mrs. Darwin was again asked for the keys to the Chevrolet which she gave them. The police took two battery-powered lanterns, one from the Chevrolet and one from the Plymouth, and a Phillips screwdriver from the rear of the Plymouth. On January 10, 1964, Darwin filed a motion to suppress all the foregoing articles, which were taken without any written warrant on December 6 and December 7, 1963. On February 18, 1964, the motion to suppress was granted, the court ordering that all property seized from Darwin be returned and that everything seized from him be suppressed as evidence. In an extensive memorandum of decision, the court held that General Statutes § 6-70, as amended by Public Acts 1963, No. 642 § 4, purporting to authorize the coroner to search and seize property without any search warrant, violated the state and federal constitutions. This ruling is not challenged by the state and of course is not challenged by Darwin.

It is admitted that the Chevrolet seized under the search warrant of February 20, 1964, had also been taken and searched, without any warrant, on December 6 and December 7, 1963. It is also admitted that sweepings had been vacuumed from the floor of the Chevrolet and placed in a plastic bag while the Chevrolet was in the possession of the police prior to the rendition of the order to suppress.

In the application of February 20, 1964, filed by

the state's attorney, seeking the search warrant for the Chevrolet and the lanterns, it was set forth that Darwin had been arrested under the bench warrant, that he had been charged with murder, and that he had used the Chevrolet and the lanterns in committing the murder. The court found that the information as to the Chevrolet car and the lanterns had been obtained prior to the illegal searches of December 6 and December 7, and that the information, since it was obtained independently of either of those searches, was not susceptible of attack as the fruits of an illegal search. See cases such as *Fahy* v. *Connecticut,* 375 U.S. 85, 91, 84 S. Ct. 229, 11 L. Ed. 2d 171; *United States* v. *Paroutian,* 299 F.2d 486, 489 (2d Cir.); s.c., 319 F.2d 661, 663 (2d Cir.), cert. denied, 375 U.S. 981, 84 S. Ct. 494, 11 L. Ed. 2d 426.

Darwin claimed at the trial that the minute and detailed descriptions of the lanterns in the application for the search warrant and in the warrant itself could not have been obtained except as a result of an examination under the original illegal seizures. His objection to the admission of the lanterns was sustained, and both were excluded. See *United States* v. *Paroutian,* supra; *Parts Mfg. Corporation* v. *Lynch,* 129 F.2d 841, 842 (2d Cir.), cert. denied, 317 U.S. 674, 63 S. Ct. 79, 87 L. Ed. 541.

On December 9, 1963, while the Chevrolet was being held by the police under the illegal search ordered by the coroner, the front-seat cushion was removed and delivered to Dr. Stolman for analysis of a stain which he found was a human bloodstain. A bag of dust and debris taken from the Chevrolet was also delivered to him. The bag was never opened by anyone, and no examination or test of its contents was made by anyone. The Chevrolet and

unopened bag of dust and debris were immediately returned, together with all other property seized, upon the granting, on February 18, 1964, of the motion to suppress.

Darwin makes much of the fact that the Chevrolet front-seat cushion was again returned to Dr. Stolman after the issuance of the search warrant of February 20 calling for the seizure of the Chevrolet, as well as of the fact that sweepings from the Chevrolet floor were again taken and sent to him. Dr. Stolman testified that a test was made on a stain not previously tested, and this stain, also, was found to be human blood. It is Darwin's claim that neither the bloodstain on the seat cushion nor the sweepings would have ever been thought of or any test of them made but for the prior illegal search. The court did not agree and concluded that the state had sustained its burden of proof that the evidence seized under the search warrant had an origin independent of the original illegal seizure. *United States* v. *Paroutian,* 319 F.2d 661, 663 (2d Cir.), cert. denied, 375 U.S. 981, 84 S. Ct. 494, 11 L. Ed. 2d 426. We can find nothing unreasonable or illegal in that conclusion. Indeed, it is about the only conclusion which could reasonably have been reached on the virtually undisputed subordinate facts found by the court. More important among these facts, known long before Darwin's arrest on the coroner's warrant on December 6, or the illegal search on that and the following day, were that there was a human bloodstain on the shirt which Darwin had worn on the night in question and that blood had been found on Hope's clothes and around her body when it was discovered on the ground. It is virtually inconceivable that even the most inexperienced police officer, with such information, would not think it

necessary to examine the Chevrolet, which Darwin admitted he had used on the night in question, for human bloodstains and other incriminating evidence. The same motivation for the original seizure and examination of the car under the purported authority of the coroner would also dictate its seizure and examination under the search warrant issued under date of February 20. The reason for the search antedated, and was independent of, anything found or learned as a result of the search of December 6 or that of December 7. Since the bag of original sweepings was never examined by anyone prior to its return, unopened, in February, the taking of the second set of sweepings could not have come about from anything found in the first set of sweepings illegally seized.

## IV

Three other claims touched upon by Darwin in his brief and the oral argument should perhaps be mentioned, although none was raised at the trial. Two of these claims attack the search warrant of February 20, on the grounds that (1) it did not appear that the judge had adequate supporting data for its issuance, and (2) that as to the sweepings it lacked adequate specificity. The third claim attacks the validity of the bench warrant on the ground that the application for it was not sworn to.

### (a)

Although attacks were made at the trial on the validity of the bench warrant, and on the validity of the search warrant, as hereinbefore considered, none of the three claims now under consideration was made and, so, no finding appropriate for its consideration is available. Under these circum-

stances the three claims now come too late. The court was never asked to rule on the claims, and under settled Connecticut practice they cannot now be considered. See *State* v. *Vars,* 154 Conn. 255, 271, 224 A.2d 744; *State* v. *Annunziato,* 154 Conn. 41, 44, 221 A.2d 57. Although in the *Vars* case we held that our procedural rule had to yield to the authority of *O'Connor* v. *Ohio,* 385 U.S. 92, 93, 87 S. Ct. 252, 17 L. Ed. 2d 189, we do not think that the *O'Connor* case is applicable here. The ratio decidendi in the *O'Connor* case, as we understand it, is that a defendant cannot be required, under a state procedural rule, to raise a claim which, at the time of trial, appeared to lack semblance of merit because it was clearly contrary to settled state law, even though the state law had been overruled by an authoritative federal decision rendered after the trial but before the hearing of the appeal. Specifically, the rule of *Griffin* v. *California,* 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, had not been laid down at the time the *O'Connor* case was tried, and the case holds that a defendant could not be required to raise such a claim at the trial since at that time Ohio's rule to the contrary was clear. The reasonableness of such a holding is apparent. But the constitutional requirements for a valid search warrant have been known at least since *Ker* v. *California,* 374 U.S. 23, 33, 83 S. Ct. 1623, 10 L. Ed. 2d 726, decided in June of 1963, over eight months before the trial in the present case began. A corresponding rule applied to an arrest warrant. *Giordenello* v. *United States,* 357 U.S. 480, 78 S. Ct. 1245, 2 L. Ed. 2d 1503 (decided in 1958). We find no justification for considering any of these claims and prefer to rest our decision on this ground. *United States* v. *Miller,* 353 F.2d 724, 725 (2d Cir.);

*United States* v. *Indiviglio,* 352 F.2d 276, 279 (2d Cir.), cert. denied, 383 U.S. 907, 86 S. Ct. 887, 15 L. Ed. 2d 663. Any other rule would be utterly unworkable under circumstances such as obtained in the present case. If the procedure now attempted by Darwin is permissible, no attorney need ever raise any constitutional claim, however well-known or long-established, since he could rest secure in the knowledge that, if the outcome of the trial proved unsatisfactory, he could raise the claim on appeal, with the added advantage that if he waited until that time the state would probably be unable to obtain a finding sufficient to permit a just review since the necessary evidence on which to predicate such a finding would not have been introduced. Except for the particular situation discussed in *O'Connor* v. *Ohio,* supra, we do not feel that the United States Supreme Court has given any such interpretation to the mandates of the federal constitution. This seems to be the view of the Court of Appeals of this circuit as set forth in *United States* v. *Paroutian,* 319 F.2d 661, 664 (2d Cir.), cert. denied, 375 U.S. 981, 84 S. Ct. 494, 11 L. Ed. 2d 426. Here, Darwin did make a proper and timely motion to suppress the articles seized under the coroner's purported authority, the motion was granted, the articles seized were excluded from evidence, and thus any error which would have flowed from their admission into evidence was avoided. Darwin also made timely attacks on the bench warrant and the search warrant as hereinbefore discussed. He should have taken action in the trial court to raise the claims now under discussion as to the search warrant and as to the bench warrant issued by the judge of the Superior Court. Note, 50 A.L.R.2d 531, 583 § 11; 5 Later Case Service, p. 108 § 11, p. 109 § 13.

Of course what has been said also applies to the claim that the search warrant issued by the judge of the Superior Court lacked, as to the sweepings, the specificity required by cases such as *Stanford* v. *Texas,* 379 U.S. 476, 485, 85 S. Ct. 506, 13 L. Ed. 2d 431, and *United States* v. *Menser,* 360 F.2d 199, 203 (2d Cir.). See *Mapp* v. *Ohio,* 367 U.S. 643, 659 n.9, 81 S. Ct. 1684, 6 L. Ed. 2d 1081.

As to the bench warrant, it is true that there is nothing in the record to show that the judge issuing it had any sworn information before him upon which he could, or did, make a finding of probable cause although, owing to Darwin's failure to raise the claim, it cannot be known what, if any, other evidence might have been offered by the state concerning the nature of the information presented to the court when the warrant was issued, such, for instance, as sworn testimony before the coroner. It is true that *State* v. *Licari,* 153 Conn. 127, 132, 214 A.2d 900, was decided November 9, 1965, long after the Darwin trial. But, as the citations in the *Licari* case show, it was merely Connecticut's recognition and acceptance of settled law as theretofore laid down by the United States Supreme Court. Consequently, Darwin's failure to raise the claim at the trial, especially since it affected jurisdiction of his person, precludes Darwin from raising it now.

### (b)

But even apart from the failure to raise the claims until the trial was over, the attack on the search warrant cannot be sustained on the merits. As previously noted, Darwin himself had admitted to Major Rome that on the night in question he had used his wife's Chevrolet. The search warrant called

for the search and seizure of the car which the state's attorney had been informed by the coroner and Major Rome had been used in the murder. The state's attorney made oath that his own records also showed this information. Darwin then stood indicted for the murder of Hope F. Rothwell. There was ample justification for the judge to find probable cause for the issuance of the search warrant, and it is clear that the judge himself made an independent finding of probable cause on the basis of the sworn information given him. This finding was in conformity with the rule of cases such as *Jaben* v. *United States,* 381 U.S. 214, 224, 85 S. Ct. 1365, 14 L. Ed. 2d 345, *Aguilar* v. *Texas,* 378 U.S. 108, 112, 84 S. Ct. 1509, 12 L. Ed. 2d 723, and *United States* v. *Menser,* 360 F.2d 199, 203 (2d Cir.). We find no merit in Darwin's claims to the contrary.

Darwin also claims that the warrant lacked the specificity as to the property to be seized which was required under the rule of cases such as *Stanford* v. *Texas,* 379 U.S. 476, 485, 85 S. Ct. 506, 13 L. Ed. 2d 431, and cases cited therein. We have been referred to no case where a warrant calling for the search and seizure of a passenger automobile has been held inadequate to include whatever was an integral part or component of that automobile. Thus, it would include any dust on the floor, scratches or dents on the body, stains on the interior, or mud on the body or chassis of that car. The warrant calling for the search and seizure of the Chevrolet, as described, was adequate to cover the front seat and cushion of the car and the dust on the floor of the car. All such things are visible on an inspection of the car itself and are separate and distinct from cargo or baggage which might be claimed to be in nowise necessarily connected with, or an integral part of,

the car itself.[1] The claim that the search warrant was inadequate to authorize the search of the car, including the car seat and the dust on the car floor, is without merit and would have been even if it had been raised at or before the trial.

Even though, because of the failure to raise the point, the deficiencies in the bench warrant were inadequate to impair the jurisdiction of the court over Darwin's person under the *Licari* rule, Darwin claims that the arrest under the bench warrant, because of its shortcomings, constituted an illegal detention, and therefore the confession of Sunday morning, made after the arrest under the bench warrant, was made during an illegal detention and thus comes within the rule of *State* v. *Traub,* 151 Conn. 246, 249, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503, in which we set forth our understanding of the holding in *Wong Sun* v. *United States,* 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441.

There are at least two answers to this claim. In the first place, the court found that the detention of Darwin in the custody of the state police was not an operative factor in causing, or bringing about, either the confession or the reenactment of the crime, and that neither of these acts by Darwin was the fruit of such detention. This conclusion, which we find reasonable, leaves the test of admissibility of the confession that of voluntariness. *State* v. *Traub,* supra, 250.

Second, Darwin could not withhold any attack on the validity of the jurisdiction of his person acquired by the arrest under the bench warrant and, after

[1] A similar rule applies in a search of the person. If legal, it includes a handbag carried by the person searched. *State* v. *Collins,* 150 Conn. 488, 491, 191 A.2d 253.

the verdict, for the first time claim that the arrest under the bench warrant was a nullity and as such made the detention under it illegal. He could not waive, by his silence and participation in a trial on the merits, a defect in the jurisdiction of his person and still preserve that defect as a ground for a claim of illegal detention prior to trial. For the foregoing reasons, we find no merit in these claims.

## V

We now come to the question of the admissibility of evidence of a reenactment and of a written confession made shortly thereafter on Sunday, December 8, 1963, prior to Darwin's arraignment under the bench warrant at 2 o'clock in the afternoon of that day.

It is important to note that the present case was tried in early 1964, that the jury brought in their verdict of guilty of murder in the second degree on March 25, 1964, that a motion to set aside the verdict was denied on April 7, 1964, and that immediately thereafter, on the same date, final judgment was rendered. It follows that under the rule laid down in *Johnson* v. *New Jersey,* 384 U.S. 719, 721, 86 S. Ct. 1772, 16 L. Ed. 2d 882, the specific holdings in *Escobedo* v. *Illinois,* 378 U.S. 478, 490, 84 S. Ct. 1758, 12 L. Ed. 2d 977, and in *Miranda* v. *Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694, are not applicable retroactively to govern this case. But the "voluntariness test" of the admissibility of confessions of course remains in full force, and it is under this test that the claims now to be considered must be determined. *Clewis* v. *Texas,* 386 U.S. 707, 87 S. Ct. 1338, 18 L. Ed. 2d 423; *Johnson* v. *New Jersey,* supra, 732; *Culombe* v. *Connecticut,* 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037; *State*

v. *Traub,* 151 Conn. 246, 250, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503.

(a)

We first consider the claim that the court could not reasonably conclude, as it had to do and did, on this interlocutory question of admissibility, that the confession and reenactment were voluntary. *Jackson* v. *Denno,* 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L. Ed. 2d 908; *State* v. *Traub,* 150 Conn. 169, 171, 187 A.2d 230, remanded on other grounds, 374 U.S. 493, 83 S. Ct. 1899, 10 L. Ed. 2d 1048. The coroner's warrant was served on Darwin at about 9:40 on the morning of December 6, at Darwin's place of employment. While Major Rome was reading the coroner's warrant to Darwin, Darwin attempted to break away and run back into the building, but he was restrained. Thereafter he carefully read the warrant himself and immediately became calm and cooperative. When he attempted to break away, he stated that he wanted to use the telephone, but he did not state whom he wanted to call, and his request was denied. He made no further request to use the telephone at any time while he was in the custody of the state police. Although he testified at the trial that he wanted to telephone his wife and counsel and at one point seemed to claim that he had so informed Major Rome at the time of the request to telephone during the reading of the coroner's warrant, the court did not credit this testimony and did not so find. Indeed, a shortcoming in Darwin's statement of facts in his brief is that some of his recitals of the facts are substituted for the facts as found by the trial court. The case was tried by a seasoned judge, and his findings of subordinate

facts, conclusions of law and rulings, as they appear of record, manifest a most careful safeguarding of Darwin's rights, constitutional and otherwise, and an awareness of the applicable law, on all claims of law raised during the trial, as laid down by the United States Supreme Court. To attempt to alter the finding, by adding to it whatever Darwin claimed during the trial and deleting from it anything inconsistent with Darwin's claims, is wholly unauthorized and useless. We were not present, and we had no opportunity to see or hear the witnesses or to judge their credibility. Necessarily the determination of Darwin's credibility must lie with the trial court as to its interlocutory rulings on the admission of the evidence in question. Unless its conclusions were unreasonable or violated some settled principle of law, they must stand. *Ker* v. *California,* 374 U.S. 23, 34, 83 S. Ct. 1623, 10 L. Ed. 2d 726.

Immediately after his arrest under the coroner's warrant on the morning of Friday, December 6, 1963, Darwin was taken to his home in Andover where the search without warrant under the coroner's direction, as previously described, took place, and then he was taken to the state police barracks at Stafford Springs where he arrived at about 11 o'clock in the morning. There is no claim that any physical violence was used on Darwin at any time, or that he was deprived of the opportunity for normal sleep, or that he was not properly fed. He was questioned by the police and conversed with them from the time of his arrest until at least 10 o'clock Friday evening and from about 6:30 on Saturday morning until 3:30 Saturday afternoon. But there is no claim that either period was spent in continuous interrogation. Indeed, Darwin's cross-examination alone practically justifies the court's

conclusion that the state had proven that Darwin's reenactment and confession were voluntary. Some further review of the facts with respect to the issue of voluntariness, however, probably should be made.

On Friday evening, a machine which appears to have been intended to induce hypnosis was brought in, and Major Rome asked Darwin to look at it and relax, but Darwin refused to look at it and, instead, commented on a break in the venetian blinds. When it became apparent that Darwin would not look at the machine, it was abandoned and never again used in Darwin's presence. Nothing was elicited from Darwin through the use of the machine. About 9 o'clock Friday evening, Darwin was told he could go to bed, but he refused and stated that he preferred to talk with the officers. He finally retired about midnight, slept in a cell on a steel cot with two blankets, and arose about 7 in the morning, when he was given breakfast. He was then taken to the state police headquarters in Hartford, arriving about 10 in the morning. Some questioning and conversation took place before and after lunch, Darwin sometimes leading the conversation. About 4 in the afternoon, Darwin appeared to have a fainting spell and on his apparent recovery was led out of the room and then went limp. While lying on the floor, he revived and, without any questioning, spontaneously said: "Oh my God, I hope my family forgives me for this." He repeated this language, in substance, a number of times, all without questioning. He was then taken into another room and placed on some cushions, and cold compresses were applied to his forehead. He asked Major Rome and another officer each to hold one of his hands, and he then orally confessed, in response to questions, to the murder of Hope F. Rothwell. By that time, Dr.

William Dwyer had arrived, having been sent for when Darwin first seemed to have fainted. Dr. Dwyer found Darwin weepy and tired but with no gross physical abnormalities. Later on, a confession was typed out. Darwin read it aloud and inserted at one point, in his own handwriting, the phrase "until she stopped breathing." Thereafter, Darwin signed "Roy F." and then stopped and said that he would not complete his signature because, if he did, he would be signing his death warrant and that his wife would be mad at him for confessing. Darwin then told Major Rome that if he could see his minister, he would sign his last name, and he was told that the police would enter into no deals with him to get a confession and that he could either sign it if it was true or let it go unsigned. Darwin then grabbed the statement and attempted to destroy it but was restrained, and the statement was recaptured. About 9:30 that evening, Darwin was taken to his cell and went to sleep. He was kept under surveillance by two officers but not interrogated by them; nor was his sleep interfered with. He awoke about 12:40 Sunday morning and became very talkative with the officers. He said that the statement he had made was untrue, and, later, that he talked in his sleep and that was why his wife probably knew that he had killed Hope Rothwell. He then said that he was letting his family and friends down and began to cry. At that time he was overwhelmed with remorse. He went to sleep again a little before 3 a.m. He awoke about 5:30 a.m. and, after indulging in some philosophical discussion, he asked for his minister and was told that it was impractical to call a minister at that hour but that he could renew his request later in the morning. He again went to sleep until about 7:30 a.m. and had breakfast about

8 a.m. About 9 a.m. he was taken into the office of Major Rome. Around 10 a.m. he was told that a bench warrant for his arrest had been obtained and that he was expected to be presented in the Superior Court under that warrant at 2 o'clock that afternoon. In addition, the legal procedure involved was explained to him. Indeed, Major Rome, in Darwin's presence and hearing, had already called the clerk of the Superior Court, and by him had been referred to the assistant clerk, to arrange for Darwin's presentation and arraignment. Thereafter, Darwin was asked whether he cared to complete his signature, being told that all that was wanted was the truth. Thereupon Darwin completed his signature. It is important to note that this confession was not admitted by the court because it felt that the state had not sustained the burden of proof that the confession was completely voluntary. Reference to the confession was brought into the case by Darwin as a part of the surrounding circumstances on which he based his claim against the admissibility of testimony concerning a reenactment and a subsequent confession made on Sunday, both of which were admitted into evidence.

After Darwin had completed his signature on the confession made the day before, Major Rome asked Darwin whether he would be willing to reenact the crime for him, and he agreed to do so. Darwin accompanied the police and reenacted the crime in detail except that he refused to indicate where the body was found, and, when they drew near the spot, Darwin refused to go further with the reenactment and it was abandoned. Coroner Ackerman was present at the partial reenactment, and Darwin was granted permission to talk to the coroner and told the coroner that he "didn't do this." He was

then taken to the Vernon police station, where he was served with the bench warrant, as previously described, at 12:50 in the early afternoon. Sergeant Leo Turcotte then asked Darwin if he would make a written confession, and Darwin said that he would but not in the presence of any other officer. Thereupon Turcotte typed in accordance with Darwin's directions, putting in and leaving out whatever Darwin wished, and Darwin signed the statement at about 1:50 in the afternoon. Prior to the typing, Darwin was warned that any statement he made could be used against him.

### (b)

The claim of Darwin now to be separately discussed, and that perhaps the most stressed, is that his counsel were denied access to him from the time of his arrest under the coroner's warrant, Friday morning, until he was arraigned Sunday afternoon at 2 o'clock, and that therefore the confession or reenactment made on Sunday could not be found to be voluntary and, so, admissible.

The court found that the confession and reenactment made on Sunday prior to arraignment were voluntary, and it admitted them. The question is whether the court could reasonably find that the state had sustained its burden of proving voluntariness as to the reenactment and the confession. *Johnson* v. *New Jersey,* 384 U.S. 719, 732, 86 S. Ct. 1772, 16 L. Ed. 2d 882.

As previously noted, Darwin did ask for, and was refused, permission to telephone at the time of the service of the coroner's warrant on Friday morning, but he did not state that he wanted to call his counsel, or any other particular person, although he had been with his counsel at the coroner's inquest, and

had testified under their guidance, the day before. He also, on two occasions, as previously related, made a request to see his minister. The particular time each request was made was obviously wholly inappropriate, and it was suggested that he renew his request during the daytime, but neither request ever was renewed.

While Darwin makes much of the so-called "incommunicado" detention, actually Darwin saw Dr. Dwyer on Saturday and was allowed to talk with Coroner Ackerman on Sunday morning. Of more importance is the testimony of Major Rome, nowhere contradicted, that he had arranged for notice to be given Mrs. Darwin of her husband's arrest on Friday under the coroner's warrant, and that she be told that she could come to see Major Rome if she wished to know anything about her husband. There is nothing to indicate that she ever made any attempt to do so, either alone or with his attorneys. It is significant that her assistance appears never to have been sought by his attorneys in their attempts to see their client.

The present case differs widely from cases such as *State* v. *Traub,* 151 Conn. 246, 247, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503, and *Clewis* v. *Texas,* 386 U.S. 707, 87 S. Ct. 1338, 18 L. Ed. 2d 423. While it does not appear that Darwin had had an extensive formal education, he was, as he himself claimed, a man of determined will whose mind could not be changed once it had been made up. He had attained considerable success in life, had a good job which he had held for some time, and was generally an informed person, well thought of in the community. He had testified before the coroner on the day before his arrest under the coroner's warrant with the guidance of his

attorneys, and of course he makes no claim that he had not been correctly instructed by them as to his rights in that connection or that they had given him to understand that his rights at the coroner's inquest did not apply to interrogation by the police.

Sunday morning, before either his reenactment or his confession to Sgt. Turcotte, Darwin was informed that he was expected to be arraigned on the bench warrant in the office of the Superior Court clerk that afternoon, and the arraignment procedure was explained to him. He knew full well that he would then see his attorneys, whom, it is important to note, he had never requested to see, and that he would leave the custody of the state police that afternoon. His refusal to complete the reenactment showed that he was master of himself and was being forced by no one.

The court found that his attorneys had endeavored to communicate with Darwin by telephone, without success, nineteen times on Friday, the first call having been placed to the Stafford police barracks at 2:25 in the afternoon; five times on Saturday; and once on Sunday morning just before Major Rome notified Darwin's counsel of the time and place of the Superior Court arraignment that afternoon.

It also found that Darwin's attorneys made one personal visitation to the Stafford barracks at 6:40 p.m. on Friday, and four personal visits to the Stafford or Hartford barracks on Saturday afternoon. In none of these visits, nor on any of the telephone calls, were they given any information as to Darwin or his whereabouts.

On Saturday afternoon, Darwin's attorneys obtained a writ of habeas corpus from a judge of the Superior Court which was given to the sheriff for service a little after 1 o'clock in the afternoon.

The writ was directed against Major Rome and Coroner Ackerman, and the sheriff was unable to locate either one on Saturday afternoon or on Sunday morning. At about 11:30 on Sunday morning, the sheriff having the habeas corpus writ for service, was notified by telephone by the chief of the Vernon police that Major Rome would be at the Superior Court in Rockville at 2 p.m.

Darwin claims that the police deliberately denied his counsel the right to see their client. The court rejected this claim. It found that under the routine procedure then followed by the state police, an investigating officer, at least in the absence of special arrangement by him, was not disturbed, during the course of an investigation, by telephone calls or otherwise; that notations of calls were made and put on the desk of the investigating officer until he had a chance to read them; and that in this instance Major Rome did not see these notations until Sunday morning, whereupon he notified counsel of the arraignment date that afternoon.

It is important to recall that we are concerned with the law prior to the decisions in the *Escobedo* and *Miranda* cases, and also prior to their effective dates, as well as to bear in mind that the question before us is not the efficiency or adequacy of the state police practices in 1963 in handling attempts by attorneys to communicate with their clients or with investigating officers engaged in an investigation. Rather, the question is whether, under all the circumstances, of which the absence of counsel is one, Darwin's reenactment and confession of Sunday met the constitutional test of voluntariness under the rule of cases such as *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037.

The court's finding of course is not absolutely conclusive nor otherwise absolutely insulated from review, but if it is reasonable under the evidence, and not violative of some rule of law, it must stand. *Ker* v. *California,* 374 U.S. 23, 34, 83 S. Ct. 1623, 10 L. Ed. 2d 726. The court saw Darwin and was best able to judge the effect of the absence of counsel on the issue of the voluntariness of his confession and reenactment, and its conclusion that the state had sustained its burden of proving that both the reenactment and the confession were voluntary must not be lightly set aside.

The subordinate facts set forth in the finding, many of which have been summarized, fully support the court's conclusions that Darwin's reenactment and confession on Sunday, before his arraignment, were proven by the state to have been voluntary; that the state proved that Darwin's will was not overcome or his capacity for self-determination impaired at the time; that neither the confession nor the reenactment were affected by any of the factors which caused the court to conclude that the state had failed to sustain its burden of proving admissible the confession of Saturday afternoon after the fainting episode; and that the detention of Darwin from Friday morning until the arraignment Sunday afternoon was not an operative factor in causing or bringing about either the reenactment or the confession, even if we were to determine, which we do not, that the detention was in any respect technically illegal. See *Wong Sun* v. *United States,* 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441; *State* v. *Traub,* 151 Conn. 246, 250, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503.

The exclusion of the confession and the admis-

sions made on Saturday was not based on the conclusion that they were proven involuntary, but on the conclusion that the state had not proven them voluntary. This determination shows a clear understanding of the test to be applied, and also that the court gave careful consideration to all of the facts in determining this question.

It is easy to understand why the court, especially in a capital case, would have a doubt as to the voluntariness of the confession of Saturday afternoon in the light of the apparent fainting spell. But its conclusion that Darwin's weepy and faint condition was because at the moment he was overwhelmed with remorse for what he had done was also reasonable. This condition of remorse was soon followed, however, by the realization that, as he himself aptly put it, to complete his signature would be to sign his death warrant. Parenthetically, it may be noted that it was a tribute to the skilful, painstaking and energetic efforts of his counsel that they were able, on the evidence, to persuade the jury to bring in a verdict of murder in the second, rather than in the first, degree. The surrounding facts showed Darwin's complete command of the situation and his self-possession and self-determination, especially when he refused to complete the reenactment. Indeed, there was testimony that he told the coroner that he had purposely misled the police, during the reenactment, as to the spot where the body had been found.

(c)

A subordinate claim of the defendant, which may be worthy of separate discussion, is that the reenactment and the second confession could not have been proven voluntary because the same conditions

obtained as on the previous day, when the excluded confession was made. There were at least three important differences in Darwin's situation on the two days. The first was that Darwin had been informed Sunday morning that he was to be arraigned that afternoon so that he no longer had any justification for even claiming to believe that he had to confess to a murder which he did not commit in order to get away from the state police. Second, he had had no fainting spell on Sunday and was in apparent good spirits considering his situation as one about to be arraigned for murder. Third, he refused to complete his reenactment, which he would not have felt free to do if he had been acting under any feelings of compulsion.

The court was justified in excluding the confession and admissions of Saturday on the ground that it felt the state had not sustained its burden of proof of establishing their voluntary character, and in further concluding that the state had sustained that burden as to the reenactment and confession of Sunday morning.

The conditions in this case bear little resemblance to those in cases such as *Leyra* v. *Denno,* 347 U.S. 556, 561, 74 S. Ct. 716, 98 L. Ed. 948, *Clewis* v. *Texas,* 386 U.S. 707, 87 S. Ct. 1338, 18 L. Ed. 2d 423, and *United States* v. *Bayer,* 331 U.S. 532, 540, 67 S. Ct. 1394, 91 L. Ed. 1654. Darwin was certainly free on Sunday morning "to confess to or deny a suspected participation in a crime". *Lyons* v. *Oklahoma,* 322 U.S. 596, 602, 64 S. Ct. 1208, 88 L. Ed. 1481; *Leyra* v. *Denno,* supra. Indeed, he virtually proved this freedom by his refusal to complete the reenactment and by his repudiation, to Coroner Ackerman, of his involvement in the murder, to say nothing of the testimony as to his statement to the coroner that

he had purposefully led the police to the wrong place in the reenactment. The conditions in the present case are stronger for the admissibility of the reenactment and confession than those in *Lyons v. Oklahoma, supra,* 598.

Darwin in effect charges the court with inconsistency in that it excluded the confession made on Saturday even though Darwin did not finally sign his last name to it until Sunday morning. We think the court correctly determined the voluntariness of the first confession under the totality of the surrounding circumstances, including those existing at the time when it was made on Saturday afternoon, rather than merely on the basis of Darwin's condition at the moment he signed his last name Sunday morning. While it could be argued, as Darwin seems to do, that, under some theory of adoption, the final signature on Sunday morning, if voluntary, would have necessarily made the entire confession voluntary, we feel this theory would do violence to our rule that the state must prove that, considering the totality of circumstances surrounding the making of a confession, it was "the product of an essentially free and unconstrained choice by the maker". *State v. Devine,* 149 Conn. 640, 653, 183 A.2d 612; *State v. Traub,* 150 Conn. 169, 175, 187 A.2d 230, remanded on other grounds, 374 U.S. 493, 83 S. Ct. 1899, 10 L. Ed. 2d 1048. We also think that this question must be determined "at the time . . . [the accused] confesses" and that this means more than merely at the moment he completes his signature to a confession. *Lyons v. Oklahoma, supra,* 602.

There was no error in the court's conclusion that the reenactment and confession made Sunday morning were voluntary, and they were properly allowed to go to the jury under the instructions given. .

The court determined the issue of voluntariness in the absence of the jury but left it to the jury to determine, in the light of the evidence, what weight, if any, to give the reenactment and confession which had been admitted. In this there was no error. *State* v. *Traub,* supra, 171. The exceptions to the charge were without merit.

Darwin objected to the admission in evidence of the confession made to Sgt. Turcotte on Sunday morning on the following grounds, as set forth in the finding: (1) Darwin's constitutional rights had been violated when Darwin was taken into custody on the basis of the coroner's warrant without being presented at the next session of the Circuit Court as required by General Statutes § 54-1b. (2) The arrest under the coroner's warrant was unconstitutional, being an unreasonable seizure. (3) The written statement signed by Darwin was not voluntary in nature. (4) The confession made Sunday to Sgt. Turcotte was taken while Darwin was held in custody and deprived of the assistance of counsel, contrary to the constitution of the United States and the constitution of Connecticut. (5) The statement was taken while Darwin was being held illegally under a bench warrant in that he had not been arraigned forthwith as required by General Statutes § 54-43. (6) The taint of a confession obtained on Saturday, December 7, which had been excluded from evidence by the court because the state failed to satisfy its burden of proving voluntariness, had not been removed when the purported written confession given on Sunday was offered through Sgt. Turcotte. Thereupon, as already stated, the court overruled the objections and admitted that confession into evidence.

The state, through Major Rome as a witness, then

offered evidence of the reenactment made Sunday morning, as previously outlined. Darwin objected to evidence of the reenactment, including photographs of it, on the same grounds as the objection made to the admission of the Sunday confession, except for the ground of objection based on the bench warrant. The exception was made because, it will be recalled, the reenactment took place before the arrest under the bench warrant and during the period of detention under the coroner's warrant. The objection was overruled, and the evidence as to the reenactment was admitted.

For the reasons hereinbefore stated, we find no error in the court's overruling of the foregoing claims and in its admitting into evidence both the reenactment and the confession. And we also find no error in the trial on the additional claims made on this appeal which were not raised at the trial and therefore were not passed upon by the trial court.

The attacks on the finding, insofar as they are not covered in this opinion, disclose no errors material to the disposition of this appeal. Indeed, they largely consist of efforts to substitute counsel's language for that of the court.

There is no error.

In this opinion the other judges concurred.