STATE OF CONNECTICUT *v.* ROBERT STODDARD
(12989)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and GLASS, Js.

Argued November 12, 1987—decision released February 2, 1988

*Jon C. Blue,* assistant public defender, with whom, on the brief, were *Joette Katz,* public defender, and *Frank Riccio,* assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Jonathan C. Benedict,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this appeal is whether the police are constitutionally required under

state law to inform a suspect whom they are holding for custodial interrogation of timely efforts by counsel to render pertinent legal assistance. The defendant, Robert Stoddard, was charged by amended information with the crime of felony murder in violation of General Statutes § 53a-54c.[1] After a jury found the defendant guilty as charged, the trial court rendered a judgment sentencing the defendant to a term of imprisonment of fifty years.

The jury could reasonably have concluded that, on the evening of March 23, 1984, the defendant went to the home of the victim knowing that the victim, who was soon to embark on a trip to Las Vegas, had a substantial amount of cash on hand. Two days later, after the victim had failed to meet a traveling companion to depart for Las Vegas, the police investigated. Entering the victim's home through an unlocked door, an investigating officer found the victim lying dead in the bathroom. A subsequent autopsy revealed that the victim had died from a single gunshot wound in the back of the neck. In their search of the victim's home, which

[1] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

had not been ransacked, the police were unable to locate the wallet, cash or jewelled rings known to belong to the victim.

On the night of the crime, the defendant borrowed a car, allegedly in order to pick up money due him from the sale of his house. He returned to the apartment where he was living approximately one and one-half hours later with more than $2000 in cash. He proceeded to destroy several credit cards and papers. After a few hours of local bar hopping, the defendant, joined by his girl friend, set out for New York City in a taxicab. On their return to Connecticut, the defendant disposed of the slide and barrel of a pistol by throwing them from the window of the moving taxi into a river. A firearms expert concluded that the slug removed from the victim had been fired from the barrel that had been thrown into the river.

On appeal, the defendant claims that the trial court should have granted his motion to suppress statements that he gave to the police because: (1) the failure of the police to inform him of counsel's repeated efforts to contact him to provide pertinent legal assistance prior to his stationhouse confession rendered inoperative his waiver of the presence of counsel; (2) his right to counsel would have attached but for an impermissible delay in arraignment, itself caused by the closing of courts on the allegedly illegal state holiday of Good Friday; and (3) his right to counsel had attached with the issuance of an arrest warrant. Because we agree with the defendant on his first claim, we need not consider the latter two.

I

The defendant contends that the due process clause of article first, § 8, of the Connecticut constitution requires the police to inform a suspect in custody of timely efforts by a specific attorney to provide perti-

nent legal assistance. As the defendant concedes, this claim is untenable under federal constitutional law. The United States Supreme Court recently held that efforts by counsel to contact an in-custody suspect have no bearing on the validity of that suspect's waiver of rights guaranteed by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *Moran* v. *Burbine,* 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).

## A

The relevant facts are undisputed. On March 27, 1984, two days after the discovery of the victim's body, the defendant, having heard that the police wanted to question him regarding the death, called a Bridgeport police detective. After telling the detective that he would not come to the station, the defendant said that on the night in question he and his girl friend went bar hopping in Bridgeport and in New York City. Roughly one week later, the defendant gave a written statement to the police following a stationhouse interview accompanied by *Miranda* warnings. In that statement, the defendant denied killing the victim. The defendant's next encounter with Bridgeport police came on Thursday, April 19, 1984, at about 1:15 p.m., when he was arrested outside his home. Before leaving for the police station, the defendant spoke briefly with his girl friend through the partly opened front door of his home.[2] The defendant was then taken to the nearby station and, en route, received *Miranda* warnings. Because the drive to the station took only two or three minutes, the defendant was in custody at the station no later than 1:30 p.m. Upon arrival, the police again apprised the defendant of his *Miranda* rights, completing the task at about 1:40 p.m. In a process normally taking thirty

[2] The defendant and his girl friend both testified that at the time of the arrest the defendant told his girl friend to contact his lawyer. Though uncontroverted, the trial court expressly refused to credit this testimony.

to forty-five minutes to complete, the defendant was booked, and then taken to a room for interrogation.

In the meantime, within fifteen minutes of the arrest, the defendant's girl friend tried to reach attorney William Fitzpatrick III, who had represented the defendant on prior charges. Informed that William Fitzpatrick was unavailable, she spoke instead with his senior partner, John Fitzpatrick, who told her that he would promptly contact the defendant. At about 1:30 p.m., Attorney Fitzpatrick made the first of four calls to the Bridgeport police station. Identifying himself as counsel for the defendant, Fitzpatrick explained that he wanted to arrange to speak with his client. On this and all subsequent calls, counsel's requests to speak with the defendant were not limited to any specific purpose. Although the trial court indicated that one of counsel's primary reasons for calling was to arrange bond for the defendant, counsel testified repeatedly that his general goal was to speak privately with his client. Because the trial court expressly credited the entirety of defense counsel's testimony and the state agreed, the record amply supports a broad interpretation of counsel's efforts.

When the officer answering counsel's first phone call said she had no record of the defendant's presence, counsel asked to speak to a higher authority. A sergeant who was summoned to handle counsel's call told him that, "we have no record of him being here." Counsel's second call, made at about 2 p.m., resulted in a similar denial of the defendant's presence at the station. Because of these responses, counsel did not personally appear at the station demanding to see the defendant, and did not ask the police not to interrogate the defendant.

Shortly into the interrogation, the defendant telephoned his girl friend at 2:17 p.m. She in turn spoke

to Attorney Fitzpatrick for a second time. Counsel thereafter called the Bridgeport police station again some time after 3 p.m., identified himself as the defendant's lawyer, and asked to speak with him. Because counsel was again told that the defendant was not on the premises, counsel made no further effort to reach his client until the next morning. Later that evening, the defendant gave a statement implicating his girl friend in the victim's death and denying that he had killed him. The defendant spent the night in the lockup of the Bridgeport station.

The next morning, counsel made a final unsuccessful attempt to contact his client. He received the same answer denying that the defendant was in the custody of the Bridgeport police. At mid-morning, however, the defendant was brought from the lockup to view newly obtained evidence, consisting of the slide and barrel of the pistol the police had retrieved from a river. After signing a card containing *Miranda* warnings, the defendant told the police he would discuss the crime. Prior to giving a written statement, the defendant also signed a waiver of rights form. By 3 p.m. that afternoon, the defendant had signed an incriminating five page statement, which was later read to the jury by one of the interrogating officers. None of the defendant's other statements was admitted at trial.

During this course of events, from arrest to confession, the defendant did not know that his attorney was making repeated efforts to contact him. Similarly, the interrogating officers had no knowledge of the efforts of counsel. In his calls, counsel did not specifically request to speak with the detective bureau, and because the front desk officer did not forward the calls, no one in the detective bureau knew of the calls.[3]

[3] At oral argument, the state conceded that, at the time of counsel's phone calls, the defendant was being held in the same building as the informa-

After a hearing, the trial court held the statement to be admissible. The court determined, inter alia, that under prevailing state and federal law the defendant had fully waived his rights to counsel and to remain silent and had freely chosen to incriminate himself. In the calculus of waiver, the court gave no weight to the repeated efforts of counsel because it found the holding of *Moran* v. *Burbine,* supra, to be controlling. After determining that the defendant was not informed of the Thursday calls because of inadvertence, however, the court stated: "I cannot personally find any excuse for failing to tell [the defendant] on Friday."

## B

The defendant first urges us to impose a duty upon police officers who are holding a suspect for custodial interrogation to act reasonably, diligently and promptly to apprise the suspect of efforts by counsel to provide pertinent and timely legal assistance. He further argues that any dereliction in the performance of this duty necessarily undermines the suspect's waiver of the right to have counsel present during questioning. While we agree with the defendant that such a duty exists, we hold instead that a waiver of rights may or may not, depending upon the totality of the circumstances, be vitiated by the failure of the police to fulfill their responsiblity to inform the suspect.

---

tion desk that received and handled counsel's requests. In an exchange with the bench, the state also acknowledged that the requests received by the information desk could be imputed to the detective bureau:

"Q. How do you explain [the failure to convey counsel's requests to the detective bureau]?

"A. Lack of communication in the police department. It's very hard to explain. And it's not good police procedure . . . .

"Q. [Defense counsel] just told me that it's all one State of Connecticut. I suppose with you it's all one police force too. The knowledge of one is the knowledge of all.

"A. I agree with you."

While the United States Supreme Court recently refused to impose a similar duty upon the police under the federal constitution, it nonetheless recognized that "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Moran* v. *Burbine,* supra, 428. This recognition, no doubt mandated in part by well known principles of federalism; *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); was also prompted by a reluctance to intrude into the administration of state criminal processes. Even though it "share[d] [the defendant's] distaste for the deliberate misleading of an officer of the court," the court stated that "[n]othing in the Constitution vests in us the authority to mandate a code of behavior for state officials" unless necessary to enforce a federal right. *Moran* v. *Burbine,* supra, 424–25. Further, in rejecting the due process claim advanced by the defendant, the court stated that the police conduct at issue did not "warrant a federal intrusion" into state criminal processes. Id., 433–34.

The appropriate task for this court, then, is to ascertain the independent meaning of the due process clause of article first, § 8, of the Connecticut constitution.[4] This state has had a long history of recognizing the significance of the right to counsel, even before that right attained federal constitutional importance. Until 1836, the common law of England denied the services of counsel to a person charged with a felony for anything but advisory guidance on questions of law. *Powell* v. *Alabama,* 287 U.S. 45, 60, 53 S. Ct. 55, 77 L. Ed. 158 (1932). This rule was defended largely on the theory that the court itself was counsel for the accused. Id., 61.

---

[4] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed."

Although in 1708 Connecticut enacted a law prohibiting pleading for hire without the express consent of the court; *State* v. *Gethers,* 197 Conn. 369, 389–90 n.19, 497 A.2d 408 (1985); the custom of assigning counsel in all criminal cases quickly became the norm. *State* v. *Davis,* 199 Conn. 88, 99, 506 A.2d 86 (1986). By the end of the eighteenth century, the Connecticut legislature had "abolished all those odious laws" arising from the English common law tradition and had assured that any person charged with a crime was "entitled to every possible privilege in making his defence, and manifesting his innocence, by the instrumentality of counsel . . . ." 2 Z. Swift, A System of Laws of the State of Connecticut (1796) p. 399.

When the customary right to counsel was formally incorporated into the Connecticut constitution in 1818, "the advice and services of counsel were regarded as crucial to a criminal defendant at any time, especially given the inability of a defendant to testify in Connecticut in 1818." *State* v. *Davis,* supra, 99–100. More contemporary developments suggest that this state's commitment to securing the right to counsel has not diminished since 1818. Not only was Connecticut "the first state to adopt the public defender system"; *State* v. *Hudson,* 154 Conn. 631, 635, 228 A.2d 132 (1967); but the right to counsel "was secured to criminal defendants in this state long before the mandate of *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 [(1962) (holding that the fourteenth amendment incorporated the sixth amendment right to counsel)] . . . ." *Spring* v. *Constantino,* 168 Conn. 563, 566–67 n.2, 362 A.2d 871 (1975). The United States Supreme Court has turned to the historical experience of Connecticut in expanding the right to counsel under the federal constitution. *Faretta* v. *California,* 422 U.S. 806, 827, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Powell* v. *Alabama,* supra, 62–63.

While this history specifically illuminates the right to counsel that attaches after the initiation of adversary judicial proceedings, it also informs the due process concerns raised by police interference with counsel's access to a custodial suspect. Cf. *State* v. *Ferrell,* 191 Conn. 37, 42 n.5, 463 A.2d 573 (1983). In recently reiterating that *Miranda* warnings are "independently required" under the due process clause of article first, § 8, of the Connecticut constitution; *State* v. *Barrett,* 205 Conn. 437, 447, 534 A.2d 219 (1987); we recognized, once again, the " 'unique ability' " of counsel to protect the rights of a client undergoing, or confronting the imminent possibility of, interrogation. Id., 447–48, quoting *Fare* v. *Michael C.,* 442 U.S. 707, 719, 99 S. Ct. 2560, 61 L. Ed. 2d 197, reh. denied, 444 U.S. 887, 100 S. Ct. 186, 62 L. Ed. 2d 121 (1979).

This recognition is in service of the traditional belief that an accused may be convicted only if "exacting measures have been taken to assure that the accused has been treated with the most scrupulous fairness" by law enforcement officials. *State* v. *Ferrell,* supra, 41. Because counsel is uniquely prepared to assist a suspect in making an intelligent and knowing decision whether to speak or stand mute, we have concluded that questioning of a suspect must cease once a clear request for counsel has been made. *State* v. *Acquin,* 187 Conn. 647, 667, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). The decision in *Miranda* v. *Arizona,* supra, 444, itself the benchmark in this area of law, required "fully effective means" of ensuring a suspect's continuous right of access to counsel.

In light of both the historical record and our due process tradition, we conclude that a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance. Armed with that information, the suspect must be permitted to choose

whether he wishes to speak with counsel, in which event interrogation must cease, or whether he will forego assistance of counsel, in which event counsel need not be afforded access to the suspect. The police may not preclude the suspect from exercising the choice to which he is constitutionally entitled by responding in less than forthright fashion to the efforts by counsel to contact the suspect. The police, because they are responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel.

We do not lightly undertake to impose additional responsibilities upon the law enforcement officials of this state but will do so where constitutional rights are squarely implicated. The duty to inform is justified not only by history and due process concerns but also by its ease of application. Within the parameters we have outlined, this duty requires only that the police act as a neutral conduit for the pertinent and timely requests by counsel to meet with a custodial suspect. In order to articulate further the scope of the duty, and to provide guidance to law enforcement officials, we deem it advisable to address several potential criticisms of the rule we announce today.

One objection that has been voiced is that a third party, such as an attorney, has no authority to invoke the personal right of the suspect to advice and presence of counsel. *Fuentes* v. *Moran,* 572 F. Sup. 1461, 1469 (D.R.I. 1983), aff'd, 733 F.2d 176 (1st Cir. 1984); *Blanks* v. *State,* 254 Ga. 420, 423, 330 S.E.2d 575 (1985). This criticism misunderstands the underlying premise of requiring the police to inform a suspect of the efforts of counsel. We recognize the proposition that the suspect alone can invoke the right to counsel. We therefore decline to follow the strict rule, adopted by the New York courts, that counsel may invoke the

rights of a suspect merely by diligently intervening in the proceeding. *People* v. *Rogers,* 48 N.Y.2d 167, 397 N.E.2d 709, 422 N.Y.S.2d 18 (1979); *People* v. *Arthur,* 22 N.Y.2d 325, 239 N.E.2d 537, 292 N.Y.S.2d 663 (1968).

We are unwilling, however, to dismiss counsel's effort to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel. *Miranda* warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel "only means that for the moment the suspect is foregoing the exercise of that conceptual privilege." *Weber* v. *State,* 457 A.2d 674, 685 (Del. 1983). Faced with a concrete offer of assistance, however, a suspect may well decide to reclaim his or her continuing right to legal assistance. "To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second." *State* v. *Haynes,* 288 Or. 59, 72, 602 P.2d 272 (1979), cert. denied, 446 U.S. 945, 100 S. Ct. 2175, 64 L. Ed. 2d 802 (1980). We cannot therefore conclude that a decision to forego the abstract offer contained in *Miranda* embodies an implied rejection of a specific opportunity to confer with a known lawyer. Accordingly, the lack of authority of counsel to invoke the personal right of the suspect is no bar to the imposition of a duty to inform a suspect of counsel's efforts. *Dunn* v. *State,* 696 S.W.2d 561, 565–69 (Tex. Crim. App. 1985).

A second criticism is that the police have no general duty to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran* v. *Burbine,*

supra, 422; *State* v. *Blanford,* 306 N.W.2d 93, 96 (Iowa 1981); *State* v. *Hanson,* 136 Wis. 2d 195, 212, 401 N.W.2d 771 (1987). Such a duty, it has been argued, would upset *Miranda's* "subtle balance" between the societal interest in securing admissions of guilt and the suspect's privilege against self-incrimination. *Moran* v. *Burbine,* supra, 426. As with the critique, discussed above, that counsel lacks authority to invoke the personal right of a suspect, we largely agree with the underlying premise of this second complaint but question its relevance to the issue at hand. It may well be that the police have no duty to provide information about such general topics as "the nature and quality of the evidence" against the suspect. *Oregon* v. *Elstad,* 470 U.S. 298, 317, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). The police conduct at issue in this case, however, consists not of a failure to supply generally useful information but of a failure to apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel.[5] *Moran* v. *Burbine,* supra, 456 n.42 (Stevens, J., dissenting); *People* v. *Houston,* 42 Cal. 3d 595, 612 n.19, 724 P.2d 1166, 230 Cal. Rptr. 141 (1986); *State* v. *Matthews,* 408 So. 2d 1274, 1278 (La. 1982); *Lewis* v. *State,* 695 P.2d 528, 530 (Okla. Crim. App. 1984).

According to a third criticism, only educated and wealthy suspects, or career criminals with established ties to counsel, will benefit from the rule we announce today. *People* v. *Houston,* supra, 622 (Lucas, J., dissenting); *State* v. *Hanson,* supra. This criticism focuses on the egalitarian premise of *Miranda* that all suspects are entitled to know their rights, not only sophisticated and astute ones. We perceive no reason, however, to

---

[5] The right of access to counsel plays a special role in the validity of confessions. The assertion in the dissenting opinion that our judgment will open up a "Pandora's Box" with respect to other kinds of conceivably helpful information therefore has no foundation.

penalize the suspect whose counsel is ready and able to provide assistance merely because there may be suspects, whether due to ignorance or poverty, who do not enjoy the same advantage. "Even the intelligent and educated layman has small or sometimes no skill in the science of law." *Powell* v. *Alabama,* supra, 69. On the other hand, suspects that may not be well educated may well know their constitutional rights in this area. Any commitment to fundamental constitutional rights must acknowledge that their use and application will differ from one situation to the next. Just as *Miranda* itself assumes that its warnings will be understood, so it is that an experienced or educated suspect can be expected to exercise those rights with greater regularity and to a more fruitful end.

Under a further critique, only intentional conduct of the police in denying access of counsel to a custodial suspect is prohibited by the duty to inform. We cannot accept such a demarcation. The essential aim of the *Miranda* rule is to ensure that a suspect is properly and fully advised of the panoply of rights afforded by the state and federal constitutions and to guarantee that any waiver of those rights is knowing, intelligent and voluntary. *State* v. *Ferrell,* supra, 42. In fulfilling this mission, "[t]he focus must be on the rights of the accused, not the innocence or culpability of the police." *Commonwealth* v. *Hilliard,* 471 Pa. 318, 323, 370 A.2d 322 (1977). Although police misconduct can figure importantly in the assessment of waiver, particularly when allegations of threats, promises and untoward inducements are made, the ultimate inquiry is whether the suspect understood and waived his rights. We therefore conclude that a test that hinges solely on intentional police interference is inconsistent with the underlying focus of the *Miranda* rule.

Finally, objections to the duty to inform have been made on practical grounds. *Moran* v. *Burbine,* supra,

425; *State* v. *Hanson,* supra. The principal objection is that a rule requiring the police to inform a suspect of efforts by counsel will undermine the clarity of the *Miranda* guidelines. This objection, however, is more concerned with the convenience of the police than with the clarity of *Miranda* guidelines. We fail to perceive any difficulty in administering a rule that simply requires the police accurately to monitor an external event, such as a telephone call from counsel. In addition, we do not regard the scope of this duty to be riddled with insoluble questions, as several courts have argued. Three such questions have been: (1) whether counsel must be physically present in the police building in order to trigger the police duty; *State* v. *Hanson,* supra; (2) whether it is enough to inform a supervisory officer even though the interrogating officer may not have personal knowledge of the request; *Moran* v. *Burbine,* supra, 425; and (3) whether counsel must have had a prior attorney-client relationship with the suspect in order to trigger the duty. *State* v. *Hanson,* supra. Answers to these questions will illustrate the simplicity of the rule we announce today.

First, counsel's phone calls in this case obviated any need for him to appear physically at the police station. Once counsel is told that his client is not in custody, it is not then reasonable to require counsel to double check the accuracy of the police answer by physically presenting himself at the station. What is required of counsel is a reasonably diligent, timely and pertinent request to consult with a client. A request is diligent if all necessary steps have been taken to notify the police clearly in the ordinary course of business, timely if made prior to the giving of incriminatory statements, and pertinent if counsel clearly indicates that access to the suspect is sought for the general purpose of providing legal assistance. In any case, counsel's request must be in a form and at a time that affords the police a reasonable opportunity to respond.

Second, lack of knowledge on the part of the interrogating officers is not dispositive because it is for the police, as an entity, to establish and maintain adequate procedures that will facilitate the reasonably prompt communication between an attorney and a suspect. See *People* v. *Garofolo,* 46 N.Y.2d 592, 600–601, 389 N.E.2d 123, 415 N.Y.S.2d 810 (1979); *People* v. *Pinzon,* 44 N.Y.2d 458, 464, 377 N.E.2d 721, 406 N.Y.S.2d 268 (1978). In this case, the Bridgeport police should have understood that they were repeatedly being asked to convey counsel's efforts to reach his client. Although there was no proof that the police deliberately misled counsel, the trial court expressly found that there was no excuse for not informing the defendant of the Friday morning call. Whether intentional or negligent, the failure to inform the defendant constitutes a violation of the duty of the police to keep track of the suspect and to serve as a neutral conduit between counsel and the suspect. Accordingly, the fact that counsel did not call directly to the detective bureau, or ask to be transferred to that bureau, does not invalidate his efforts.

Third, the prior existence of an attorney-client relationship is not relevant to the duty itself. While a suspect may decline the proffered services of a lawyer who unilaterally intervenes in the proceeding, we think it unwise to impose upon the police the responsibility of ascertaining the nature of the putative relationship between counsel and the suspect. The existence, or lack thereof, of an attorney-client nexus relates to the question of waiver, which we take up in part II of this opinion. We therefore decline to import this factor into the threshold question of the duty to inform.

## II

Although we agree with the defendant that the police have a duty to inform a custodial suspect of counsel's efforts to provide legal advice, our inquiry is not at an

end. We must next consider in what circumstances statements obtained in violation of this duty must be suppressed. The resolution of this question hinges on well known principles governing the waiver of constitutional rights.

The right to have counsel present during interrogation can be waived by the suspect. "The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights, including his right to remain silent [and to presence of counsel]. *State* v. *Boscarino,* 204 Conn. 714, 743, 529 A.2d 1260 (1987); *State* v. *Hernandez,* 204 Conn. 377, 395, 528 A.2d 794 (1987); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Toste,* 198 Conn. 573, 579–80, 504 A.2d 1036 (1986). A valid waiver is defined, in accordance with the well known test of *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), as the intentional relinquishment or abandonment of a known right. *State* v. *Shockley,* 188 Conn. 697, 706, 453 A.2d 441 (1982); *State* v. *Reed,* 174 Conn. 287, 293, 386 A.2d 243 (1978)." *State* v. *Barrett,* 449–50. An effective waiver, however, "presupposes full knowledge of the right or privilege allegedly waived." *State* v. *Ramos,* 201 Conn. 598, 603, 519 A.2d 9 (1986). In addition, the waiver must be "accomplished with sufficient awareness of the relevant circumstances and likely consequences." *State* v. *Reed,* supra. Even after a suspect has validly waived his or her rights, there exists a "continuous opportunity" to invoke or reinvoke the rights "in any manner and at any stage of the process" of interrogation. *Miranda* v. *Arizona,* supra, 444–45. We therefore conclude that a waiver of presence of counsel can, under certain circumstances, be shown invalid if the police fail to inform a suspect of the efforts by counsel.

The question before us is how to interpolate into the calculus of waiver the failure of the police to inform

a suspect of inquiries by counsel. Courts in other jurisdictions have taken two views of this issue. Some have adopted a per se rule of exclusion in order to enforce the duty to inform. Others have taken a more open ended examination of the totality of the circumstances.

In the majority of reported cases, the rule has been that a lack of knowledge always fatally undermines the suspect's continuing right to claim the presence of counsel. The principal reason for adhering to a per se rule of exclusion is ably stated by the Supreme Court of Oregon: "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity." *State* v. *Haynes,* supra, 75; see also *People* v. *Houston,* supra, 610; *Weber* v. *State,* supra, 685; *People* v. *Holland,* 147 Ill. App. 3d 323, 332–33, 497 N.E.2d 1230 (1986); *State* v. *Matthews,* supra, 1278; *Commonwealth* v. *Sherman,* 389 Mass. 287, 291, 450 N.E.2d 566 (1983); *People* v. *Garofolo,* supra, 599; *State* v. *Stephens,* 300 N.C. 321, 327, 266 S.E.2d 588 (1980); *Lewis* v. *State,* supra, 531; *Commonwealth* v. *Hilliard,* supra, 322; *State* v. *Jones,* 19 Wash. App. 850, 854, 578 P.2d 71 (1978).

We do not agree with the majority rule. The decision to speak or to stand mute is a personal right of the suspect. That decision, made on the basis of full knowledge of all relevant circumstances, belongs exclusively to him. *Commonwealth* v. *Sherman,* supra, 292. Had the police officials in this case properly responded with the communication, the defendant might conceivably have taken the advice of counsel to remain silent. *Commonwealth* v. *McKenna,* 355 Mass. 313, 324, 244 N.E.2d 560 (1969); *People* v. *Garofolo,* supra, 600. By the same token, the suspect might have chosen to cooperate with the police and waive the presence of counsel. *State* v. *Murphy,* 44 Wash. App. 290, 292–94,

721 P.2d 30 (1986). We therefore decline to impose, by judicial fiat, a blanket rule of exclusion or admissibility.

Reliance on the totality of the circumstances is consistent with existing rules for the evaluation of the validity of a waiver. *State* v. *Boscarino,* supra, 743; *State* v. *Hernandez,* supra, 395; *State* v. *Chung,* supra, 48. The critical question is whether the information not conveyed by the police would likely have changed the defendant's appraisal and understanding of the circumstances. *Fuentes* v. *Moran,* supra, 1471; *Dunn* v. *State,* supra, 569. Of particular, but not exclusive, relevance are such facts and circumstances as the relationship of the suspect to the attorney, the nature of counsel's request, the extent to which the police had reasonable notice of counsel's request and the conduct of the suspect. *Fuentes* v. *Moran,* supra, 1470; *Dunn* v. *State,* supra, 568.

In this case, the trial court concluded that the defendant had validly waived his *Miranda* rights. This ruling is challenged only on the basis that the trial court afforded no weight to efforts by counsel to contact the defendant. By implication, then, the defendant does not challenge the trial court's conclusion that the police did not threaten or intimidate the defendant or use actual force to extract his incriminatory statement of Friday, April 20, 1984. On appeal, the defendant's claim is solely that the failure of the police to discharge their duty to keep him informed of counsel's efforts robbed his waiver of the required elements of knowledge and intelligence.

Facing similar claims, courts in other jurisdictions have come to varied conclusions. A federal district court in *Fuentes* v. *Moran,* supra, refused to order suppression. This holding rested largely on the narrowness of counsel's request. After reviewing the record, the court concluded that counsel had called the station twice for

the limited purpose of ascertaining the custodial status of his client. Neither call, the court held, could be characterized as an attempt to contact the suspect for the general purpose of providing advice on the exercise of constitutional rights. Id., 1472. Accordingly, the court held that it was not reasonably likely that the suspect would have changed his appraisal and understanding of the circumstances had he known of the efforts by counsel. By contrast, the court in *Dunn* v. *State,* supra, after applying a totality of the circumstances test, concluded that suppression was required. In reaching its conclusion that the "appellant . . . if given a knowing and intelligent choice, might certainly have opted to remain silent," the court placed particular reliance on the ready availability of counsel to provide advice of a general nature. Id., 569.

The record in this case, taken as a whole, reveals at least a reasonable likelihood that the defendant would have invoked his right to counsel had the police fulfilled their duty to inform. First, the content of counsel's aborted communications over a period of two days was pertinent to the exercise of the right to counsel. Because counsel's requests to speak with the defendant were phrased generally, and not specifically limited to a topic, such as bail, that has no bearing on the right to counsel, we can fairly infer that counsel would have advised the defendant to remain silent. *Watts* v. *Indiana,* 338 U.S. 49, 59, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949) (Jackson, J., concurring). Second, because counsel was a member of a firm that had previously represented the defendant, the defendant could reasonably have been expected to respond to counsel's offer of assistance.

Under the totality of the circumstances, the state has not met its burden of proving by a preponderance of the evidence that the efforts of counsel, if properly communicated, would not have altered the defendant's

appraisal and understanding of the circumstances. Accordingly, the trial court erred in denying the defendant's motion to suppress.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion HEALEY and GLASS, Js., concurred.

SHEA, J., with whom CALLAHAN, J., joins, dissenting. As the majority opinion recognizes, the United States Supreme Court has held in a case remarkably similar to this one that failure of the police to inform a person held in custody of a telephone call from an attorney engaged by another, without the request or knowledge of the suspect, does not undermine an otherwise valid waiver of his rights under the fifth amendment to our federal constitution to remain silent and to the presence of counsel during interrogation.[1] *Moran* v. *Burbine,* 475 U.S. 412, 422, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." Id.

The majority, nevertheless, rejects this view and, under the aegis of our state constitution, imposes upon the police in Connecticut a significant addition to the standard warnings required by *Miranda* v. *Arizona,*

[1] The United States Supreme Court also held that a defendant's right to counsel under the sixth amendment to our federal constitution was not violated because he had confessed while unaware of the telephone call from the attorney. *Moran* v. *Burbine,* 475 U.S. 412, 422–34, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). "Because . . . the events that led to the inculpatory statements preceded the formal initiation of adversary judicial proceedings, we reject the contention that the conduct of the police violated [the defendant's] rights under the Sixth Amendment." Id., 432; see *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972). The majority opinion does not question this part of *Moran.*

384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). This further obligation is that the police must inform a suspect in custody, prior to questioning him, that any attorney who may have telephoned, whether known to him or not, wishes to speak to him. Breach of that duty, whether by design or inadvertence, as in this case, is deemed to vitiate an otherwise knowledgeable waiver of the right of silence, unless the state is able to demonstrate that "the efforts of counsel, if properly communicated, would not have altered the [suspect's] appraisal and understanding of the circumstances."

The majority has thus created a significant expansion of *Miranda*, likely to impact a large proportion of those presently uncommon cases in which otherwise valid confessions have been obtained but the police have failed to inform the defendant that a lawyer had called him before he confessed. It will be a rare case where the state can show that knowledge of the call would not have affected the defendant's decision to respond to police interrogation without legal assistance. Cf. *State* v. *Murphy*, 44 Wash. App. 290, 292–94, 721 P.2d 30 (1986). It would be an even less frequent event for an attorney, given the opportunity to speak to a suspect, not to advise him immediately to say nothing to the police. "[A]ny lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts* v. *Indiana*, 338 U.S. 49, 59, 69 S. Ct. 1347, 93 L. Ed. 2d 1801 (1949) (Jackson, J., concurring).

In this instance we are concerned with police frustration of access by an attorney to a suspect, a situation that has not occurred frequently in this state, but is not entirely unprecedented. See *State* v. *Darwin*, 155 Conn. 124, 155, 230 A.2d 573 (1967), rev'd and remanded, 391 U.S. 346, 88 S. Ct. 1488, 20 L. Ed. 2d 630 (1968).[2] The majority opinion holds that "the prior

---

[2] In *State* v. *Darwin*, 155 Conn. 124, 230 A.2d 573 (1967), the attorneys, whose efforts to contact the defendant after his arrest on a coroner's war-

existence of an attorney-client relationship is not relevant to the duty" of the police to inform a suspect that some lawyer wants to talk to him, but only to whether the suspect "could reasonably have been expected to respond to counsel's offer of assistance." This view has the potential for dramatically upsetting the balance struck by *Miranda* in resolving the dilemma for a free society posed by police interrogation of a suspect. *Watts* v. *Indiana,* supra. "To subject one without counsel to questioning which may and is intended to convict him, is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime, because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent—and that in such a capacity he owes no duty whatever to help society solve its crime problem." Id. If the prior existence of an attorney-client relationship is irrelevant to the duty imposed by the majority, it appears that any attorney may volunteer his advice to one held in custody and the police are then obliged to inform a suspect of that offer.

Furthermore, since the majority opinion declares that "[t]he critical question is whether the information conveyed by the police would likely have changed the defendant's appraisal and understanding of the circumstances," and is not grounded upon any attempt by the suspect to exercise his right to counsel, the logical implication is that the police have a duty to inform a suspect of an attempt to communicate with him by any person. A telephone call from someone without any legal training, such as a relative, friend, or even a total stranger might well provide a suspect with information "that would likely have changed [his] appraisal and understanding of the circumstances." Since the rationale of the majority is that being told that a lawyer has

rant were deliberately frustrated by the state police, had previously conseled him at the coroner's inquest where he had testified as a witness.

sought to converse with a suspect is essential to a knowledgeable waiver of his right to remain silent, attempts by others to warn him to say nothing to the police or to obtain legal assistance are not readily distinguishable from efforts of lawyers unsolicited by the suspect to convey the same information to him.

Indeed, if a knowledgeable waiver of the privilege against self-incrimination requires that a suspect be informed of every circumstance known to the police that might have affected his decision to confess, we open a veritable Pandora's box. Heretofore courts have at least implicitly tolerated some of the less extreme forms of deception practiced by the police with the intention of inducing a suspect to confess as a kind of evil necessary for an effective interrogation process. *Oregon* v. *Mathiason*, 429 U.S. 492, 493–96, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Michigan* v. *Mosley*, 423 U.S. 96, 98 n.3, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975); *State* v. *Falby*, 187 Conn. 6, 14–16, 444 A.2d 213 (1982); see generally W. White, "Police Trickery in Inducing Confessions," 127 U. Pa. L. Rev. 581 (1979). Are we now sub silentio signalling a new look at these cases leading to the imposition upon the police in their confrontations with criminals of standards more appropriate for those in a fiduciary relationship, "the punctilio of an honor the most sensitive?" *Meinhard* v. *Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928); see *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 407, 456 A.2d 325 (1983).

It cannot be denied that under our system the question of guilt or innocence turns not upon the facts but upon "only such evidence as [the defendant] cannot conceal from the authorities, who cannot compel him to testify in court and also cannot question him before," without complying with the prophylactic standards of *Miranda*. *Watts* v. *Indiana*, supra, 59. We have accepted these restrictions on the ability of the state

to prosecute crime as "a necessary price to pay for the fairness we know as 'due process of law.'" Id., 62. *Miranda* represents a compromise between the need of the state for effective interrogation of a suspect to solve a crime and the right of the individual to say nothing that may incriminate him. I am not inclined to upset this delicate balance that the police by now have learned to live with and thus increase the handicap on society in determining the truth in criminal investigations.

In deciding that the due process clause of our state constitution demands this new embellishment of *Miranda,* despite the rejection of such an interpretation of the identical language of the corresponding provision of our federal constitution by the United States Supreme Court, the majority relies upon the history of the laudable role this state has performed in the implementation of the right to counsel. As the majority concedes, this history "specifically illuminates the right to counsel that attaches after the initiation of adversary judicial proceedings," i.e., the right specifically set forth in the sixth amendment to our federal constitution and in article first, § 8, of our state constitution. The majority does not question the holding in *Moran* that this right of counsel is not involved in questioning a suspect prior to initiation of formal criminal proceedings.[3] Such illumination as is shed by the authorities cited, however, does not even remotely suggest that the right of counsel, even if advanced to the custodial interrogation stage of the proceeding, may be exercised by anyone but the person it is designed to protect. When a suspect, after being given the *Miranda* prescribed advice that he may have counsel present during a police interrogation, has declined such assistance, a telephone call from a lawyer unsolicited by the suspect can hardly be regarded as an assertion by the suspect of *his* right

[3] See footnote 1, supra.

to counsel, whether based on our state or federal constitution.[4]

Thus the position taken by the majority for broadening the protection available to a criminal suspect in Connecticut beyond that federally required by *Miranda* finds no support in any textual difference between the state and federal constitutional provisions and very little in applicable precedent. It stems, therefore, primarily from the view of the majority that the concept of fairness epitomized in the due process clause demands greater limitations on the police in this state than those imposed by *Miranda*. I believe that due process fairness, under our state as well as our federal constitution, must take into account the "felt necessities of the time"; O. W. Holmes, Jr., The Common Law (1881) p. 1; one of which is the magnitude of our crime problem. I would not, therefore, place this further restriction upon effective police interrogations when conducted in Connecticut.

Accordingly, I dissent.

---

[4] Although the majority opinion does "recognize the proposition that the suspect alone can invoke the right to counsel," it, nevertheless, assumes that the due process right of a suspect to counsel at a police interrogation may effectively be triggered by an attorney not engaged or requested by the suspect. It appears to equate the suspect's right of access to counsel at such an interrogation as encompassing a right on the part of an attorney to have access to a suspect with whom he has had no previous relationship.