[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION TO SUPPRESS CONFESSION, STATEMENTS AND/OR ADMISSIONS
The defendant, James Gordon "Bo" Gritz, has been charged with attempt to commit kidnapping in the second degree, in violation of General Statutes §§ 53a-49 (a)(2) and 53a-94(a); conspiracy to commit kidnapping in the second degree, in violation of General Statutes §§ 53a-48(a) and 53a-94(a); attempt to commit custodial interference in the first degree, in violation of General Statutes §§ 53a-49(a)(2), 53-97(a)(2) and 53a-8(a); conspiracy to commit custodial interference in the first degree in, violation of General Statutes §§ 53a-48 (a), 53a-97(a)(2) and 53a-8(a); and loitering on school grounds, in violation of General Statutes § 53a-185(a). Through his Motion to Suppress Confession, Statements and/or Admissions, dated January 28, 1998, CT Page 1425-p the defendant has requested that this court suppress any and all statements he is reported to have made at the Suffield Police Station on the day of September 30, 1996. In support of his motion, the defendant claims that such statements were obtained in violation of the defendant's rights under the Fourth, Fifth,Sixth and Fourteenth Amendments to the United States constitution, and in further violation of the provisions of article 1, § 8 of the Connecticut constitution. The court finds this matter in favor of the defendant, and grants his motion to suppress all any and all statements he is alleged to have made under those circumstances which are set forth below.
In determining the relevant facts pertinent to the pending issues, the court has considered the credible testimony and evidence presented at the suppression hearing conducted before the court on December 10, 14 and 21, 1999. By stipulation of the parties submitted on December 14, 1999, the court may also observe facts that were derived from the hearing conducted on December 7, 8, 9, 10, 14 and 21, 1999, in consideration of the defendant's motion to suppress fruits of a search and seizure that occurred on September 30, 1996.[1] Additional factual issues, specifically related to the instant motion to suppress, are addressed herein. From this evidence, and the reasonable and logical inferences drawn from the facts proven, the court finds as follows:
The defendant was arrested in Suffield Connecticut at approximately 2:30 p.m. on September 30, 1999, upon the grounds of the McAllister Middle School in that municipality. Thereafter, he was directly transported to the Suffield police station, where Suffield police officer Craig Huntley orally advised the defendant of his constitutional rights sometime after 3:00 p.m.[2] The defendant refused to sign the form used by the Suffield Police Department to acknowledge that an accused individual had been apprised of these rights. In contravention of customary Suffield police department practice, no officer's signature was recorded on this document to corroborate the defendant's apparent refusal to sign the form.
At some time shortly before 4:00 p.m. on September 30, 1996, CT Page 1425-q Attorney Jon Schoenhorn received a call at his Hartford law office requesting assistance concerning "James Gritz." Identified to Schoenhorn only as "Scott", the caller asked the attorney to call the Suffield police department, and to inquire about the status of Gritz. While Schoenhom had never represented Gritz in the past, phone calls like this were commonly received in the course of his busy criminal defense law practice.[3] At approximately 4:00 p.m., Schoenhorn called the Suffield Police Department and spoke with a dispatcher named "Markowski." Identifying himself as Jon Schoenhoni, an attorney from Hartford, he inquired whether there was a person in Suffield police custody under the name of James Gritz, and he further asked to speak with Gritz. Schoenhorn was placed "on hold" for about four or five minutes. He was then told that there was no such person being detained at the Suffield Police Department. Twenty or thirty minutes later, Schoenhorn received another call at his law office, from a man who asked if he had been able to speak to Gritz. Answering in the negative, Schoenhorn then called the police department again between 4:30 and 4:45 p.m., and talked to the same dispatcher. On this occasion, Schoenhorn asked if there was anyone at all being detained as a prisoner at the Suffield police department, and reported that he had received the information that someone named "James Gritz" was being held. He was again placed "on hold". A male came to the phone, and identified himself as a sergeant at the Suffield police department. Schoenhorn repeated his request and report, and asked if any charges had been brought against a "James Gritz." The sergeant answered by indicating that they did not have "James Gritz" in custody and that no charges had been brought against such person.
Tape recordings made in the course of the business of the Suffield police department indicate that at 4:37 p.m. on September 30, 1996, an individual identifying himself as "Tom Scott placed a call called to that department. The dispatcher identified herself to this caller as "Markowski." "Tom Scott" asked if there was they had booked someone by the name of Gritz. At 4:39 p.m., the dispatcher replied that she had looked through the arrest warrants, and did not see anybody by that name. CT Page 1425-r
At some time on the afternoon of September 30, 1996, Officer David Reese, who had arrested the defendant at the McAllister School, advised fellow members of the Suffield police department that the defendant was a part of a militia movement. Reese and Williams, the department Chief, discussed the probability that (fritz had co-conspirators who were likely still at large, and who could be in a position to attempt to unlawfully take the children of Linda Wiegand away from their home in Suffield. Reese and Williams also discussed the possibility that "the militia" could come to Suffield to try to free the defendant or to harm Thomas Wilkinson, the lawful custodian of the Wiegand children. Chief Williams issued a policy prohibiting any employees of the Suffield police department from disseminating any information concerning the defendant or his status at that department. This policy was intended to be effective for a short period of time, until the Suffield police felt they had achieved control of the situation, and until they taken appropriate steps to assure the safety of the Wiegand children, Witkinson and Suffield police department employees.
Discomfited about the inconsistent information he had been receiving about the status of "James Gritz", Schoenhorn called the Suffield police department a third time at about 4:45 or 5:00 p.m., reaching the same dispatcher. When Schoenhorn asked to speak to a supervisor, the dispatcher stated that there was none available. Schoenhorn responded by stating his intention to call the Chief State's Attorney to report the situation. A man who identified himself as Chief Williams then came to the phone. Schoenhorn again identified himself as Jon Schoenhorn, an attorney, and inquired about "James Gritz". Williams reported that James Gordon Gritz and James R. Gritz had been charged with attempted kidnapping and were being held on $1,000,000 bond. When Schoenhorn asked to speak with the accuseds, the line was disconnected.
Thereafter, Schoenhorn traveled to the Suffield police department, arriving at about 6:00 or 6:30 p.m. on the evening of September 30, 1996. Schoenhorn went to the reception window, provided his business card, and asked to see Mr. Gritz. He was CT Page 1425-s told to wait. Schoenhorn waited in the public lobby area for approximately about 45 minutes to an hour. During this time, the physical design of the Suffield police department enabled Schoenhorn to overhear a conversation between two men he could not identify. Schoenhorn heard his name mentioned, and further heard one man state that since "they" hadn't called an attorney, the police did not have to tell them that any attorney was waiting. Williams eventually came out into the lobby area, whereupon Schoenhorn introduced himself; stated that he was there to see James Gritz, specified that he did not want the defendant to be interviewed or to talk to anyone at the department. Williams indicated that because the defendants had not requested his assistance or attendance, he was under no obligation to tell them that an attorney was present on their behalf; or that they should not talk to anyone. Although Schoenhorn cited the provisions of State v. Stoddard to Williams, and explained the protections of the Connecticut constitution, which were broader that those offered through the United States constitution, Williams still refused to let Schoenhorn speak to the defendant. Williams left the public area, but returned soon thereafter, stating that the accuseds wanted to talk with Schoenhorn. Schoenhorn was then allowed to meet in private with the defendant and James R. Gritz whereupon he learned that the two men had been already been questioned by the Suffield Police Department and a federal agent.
Detective David Winter of the Suffield police department testified that he had, in fact, interviewed the defendant with Special Agent Bamford of the FBI. This interview was conducted on the premises of the Suffield police department, starting at 5:03 p.m. on September 30, 1996. Bamford orally advised the defendant of his Miranda rights, and the defendant agreed to speak with them. Bamford questioned the defendant while Winter listened and took notes. The defendant stated that he had met with Linda Wiegand that morning at a "Budget Inn", and that he had obtained prescription medication from her so he could treat his ear infection. The defendant admitted to having a phone number at which Wiegand could be reached, but he refused to provide it to the officers. The defendant stated that Wiegand had previously sent him a letter, and that she had appeared on his radio show. CT Page 1425-t The defendant had taken Linda Wiegand to see an attorney, Gerry Spence. Shown a set of keys, the defendant indicated that they were for his airplane. The defendant indicated that he had borrowed the Mitsubishi from Wiegand. The defendant stated that he had recently seen Wiegand at a local Friendly's Restaurant. He also stated that at a Friendly's restaurant, he had met a man who had a 1957 Chevy for sale, and that this man was to meet the defendant at the school at 2:00 p.m. The defendant indicated that he was in Connecticut to be on a radio program, promoting a pain relief device, and to meet with an owner of the radio station. The interview concluded prior to 6:20 p.m., when Winter and Bamford began an interview with James R. Gritz at the Suffield police department. During the interview of the defendant, Winter was never provided with information, from any source, indicating that an attorney had called and wanted to speak with the defendant. During the interview, Winter never told the defendant that an attorney was trying to reach him.
 I POLICE DUTY TO INFORM DETAINEE OF ATTORNEY'S CONTACT
The defendant specifically seeks to suppress all written and/or oral statements provided by him to law enforcement authorities after Schoenhorn, an attorney, initiated his efforts to contact him. In his motion, the defendant relies upon the defendant's alleged incompetency; the ineffectiveness of the officers' advisements and the involuntariness of his waivers; and the attachment of the right to counsel; and the protections ostensibly offered to him, under such circumstances, by the United States constitution.[4] The court finds these arguments unavailing, but concurs with the defendant's claim that any statements made by the custodial defendant to police authorities, after Schoenhorn made his first attempt to communicate with him, were obtained in derogation of the provisions of article first, § 8 of the Connecticut constitution.
As the basis for this claim, the defendant principally relies upon the Connecticut Supreme Court's interpretation of the protections extended through these constitutional provisions, as CT Page 1425-u explicated in State v. Stoddard, 206 Conn. 157, 166-67,537 A.2d 446 (1988). "In State v. Stoddard, [the Court] held that the due process clause of article first, § 8 of the Connecticut constitution requires the police to inform a suspect whom they are holding for custodial interrogation of timely efforts by counsel to render pertinent legal assistance." State v. Cobb,251 Conn. 285, 354, ___ A.2d ___ (1999). The public policy basis for this protocol was succinctly states as follows: "The police, because they are responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel." State v. Stoddard, supra, 206 Conn. 167.
An analysis of the relevant factual basis underlying theStoddard decision illustrates the clear application of that protocol to the issues before this court. In Stoddard, the defendant was arrested at about 1:15 p.m. on April 19, 1984.State v. Stoddard, supra, 206 Conn. 160. The defendant was taken to the station and advised of his Miranda rights twice before 1:40 p.m. Id., 160-61. A third party, the defendant's girlfriend, called the defendant's former attorney to obtain assistance; as this attorney was unavailable, she instead spoke with another lawyer at the same firm. Id., 161. This attorney made three phone calls to the police station between 1:30 and some time after 3:00 p.m., specifically identifying himself as counsel for the defendant and asking to make arrangements to speak with the defendant on each occasion Id., 161-62. The attorney did not further specify his purpose for wanting to speak to the defendant. Id., 161. Each time he called the police station, the attorney was told that his client was not on the premises. Id. 161-62. That night, following these ineffective attempts by counsel to obtain contact with the accused, the defendant gave the police a statement, and spent the night in lock-up at the police station. Id. 162. Counsel made a final phone call the next morning to the police station and again was told that the defendant was not in custody. Id. Later that day, the defendant signed a written waiver of rights form and executed a self-incriminating statement in writing. Id. During the entire time he was in custody, including the times when he provided these statements, the defendant was not advised, and did not know, that an attorney was attempting to reach him. Id. CT Page 1425-v
Stoddard established the measure by which a trial court should evaluate whether or not an attorney has made a sufficient attempt to contact a defendant in custody, for purposes of claiming the constitutional protections at issue. "What is required of counsel is a reasonably diligent, timely and pertinent request to consult with a client. A request is diligent if all necessary steps have been taken to notify the police clearly in the ordinary course of business, timely, if made prior to the giving of incriminatory statements, and pertinent if counsel clearly indicates that access to the suspect is sought for the general purpose of providing legal assistance." State v. Stoddard, supra,206 Conn. 171. The Stoddard court established that telephone calls from an attorney to an accused constitute effective indication of a request to consult with a client. "[Counsel's phone calls . . ., obviated any need for him to appear physically at the police station. Once counsel is told that his client is not in custody, it is not then reasonable to require counsel to double check the accuracy of the police answer by physically presenting himself at the station." Id.
Applying the Stoddard rule to the facts of this case, it is clear that Schoenhorn's three phone calls, occurring before he took the tenacious route of physically traveling to The Suffield police department in an effort to locate the defendant, obviated any need for him appear physically at the station to make a diligent, timely and pertinent request to speak with the defendant. State v. Stoddard, supra, 206 Conn. 171. Schoenhorn's three phone calls evince a thorough, persistent and diligent attempt to notify the police, in the ordinary course of business, of his interest in the accused. Id. The phone calls were pertinent in that Schoenhorn identified himself as an attorney on each occasion, and indicated that he sought access to the defendant for the general purpose of providing legal assistance,as well as for possible representation of the defendant. Id. Schoenhorn's requests were timely because he requested the opportunity to speak with the defendant as early as 4:00 p.m. on September 30, 1996, and again between 4:30 and 4:45 p.m. on that date, prior to the defendant's interview with and provision of statements to Winter and Bamford. Id., 167, 171.
In evaluating the circumstances at issue, this court is not CT Page 1425-w required to find that a particular agent of the Suffield police department, such as Markowski or Winter, had actual knowledge that "James (fritz" was in their custody, in order to effectuate the Stoddard rule. The court in Stoddard specifically noted that "lack of knowledge on the part of the interrogating officers is not dispositive because it is for the police, as an entity, to establish and maintain adequate procedures that will facilitate the reasonably prompt communication between an attorney and a suspect." Id., 172. Thus, the court attributes little weight to the argument that neither Winter nor other personnel working at the Suffield police department on September 30, 1996, actually knew of the whereabouts of the defendant at the time Schoenhorn's calls were received.
In addition, the constitutional protections set forth throughStoddard are not dependent upon the existence of a prior or existing relationship between a custodial defendant and an attorney who is trying to contact him. The Stoddard court held that "the prior existence of an attorney-client relationship is not relevant to the duty itself. While a suspect may decline the proffered services of a lawyer who unilaterally intervenes in the proceeding, we think it unwise to impose upon the police the responsibility of ascertaining the nature of the putative relationship between counsel and the suspect." State v. Stoddard
supra, 206 Conn. 172. Thus the court cannot properly attribute a failure to apply the Stoddard rule to the lack of evidence establishing that there was an extant attorney-client relationship between Schoenhorn and the defendant at the time Schoenhorn placed his phone calls to the Suffield police department . . .
The court, therefore, finds that the Suffield police department had an affirmative duty to inform the defendant that Schoenhorn was attempting to speak with him, and further finds that this duty commenced with the attorney's first phone call to that department at approximately 4:00 p.m. on September 30, 1996. By failing to properly inform the defendant, as required by the protocol enunciated in State v. Stoddard, supra, the Suffield police acted in derogation of the defendant's rights preserved under the provisions of article first, § 8 of the Connecticut constitution. CT Page 1425-x
 II EFFECT OF AN ATTORNEY'S EFFORTS TO CONTACT THE CUSTODIAL DEFENDANT
Having identified the constitutional violations, the Court must still address the issue of whether the defendant's statements, provided at the Suffield police department, should be suppressed. In so doing, the court must determine whether the defendant effectively waived his right to counsel before delivering his statements, and/or whether he would likely have been affected in his willingness to speak to the law enforcement agents had he known that Schoenhorn was trying to reach him.
Concerning the effectiveness of an accused's waiver of the right to remain silent while in police custody, our Supreme Court recently acknowledged that it has declined to impose a per se rule requiring suppression of statements made under circumstances which constitute a violation of the Stoddard duty of disclosure concerning an attorney's efforts to contact the accused. SeeState v. Cobb, supra, 251 Conn. 356. "[T]he decision to speak or to stand mute is a personal right of the suspect, which is to [be] made exclusively [by] him on the basis of full knowledge of all of the relevant circumstances. . . . Based upon the totality of the circumstances . . . [t]he critical question is whether the information not conveyed by the police would likely have changed the defendant's appraisal and understanding of the circumstances . . . of particular, but not exclusive, relevance are such facts and circumstances as the relationship of the suspect to the attorney, the nature of counsel's request, the extent to which the police had reasonable notice of counsel's request and the conduct of the suspect. . . . The state has theburden of proving beyond a preponderance of the evidence that theefforts of counsel, if properly communicated, would not havealtered the defendant "s decision to speak with the police. . . .
This burden, moreover, is to be evaluated under the totality of the circumstances." (Emphasis added; citations omitted; internal quotation marks omitted.) State v. Cobb, supra, 251 Conn. 356.
Upon evaluation of the available record, the Stoddard court CT Page 1425-y identified the basis for concluding, to a reasonable likelihood, that the defendant would have invoked his right to counsel had the police fulfilled their duty to inform him that an attorney was trying to reach him. Because the content of counsel's communications was pertinent to the defendant's exercise of the rights to counsel and to refrain from offering statements, and because counsel's requests to speak with the defendant were phrased generally, the court fairly inferred that counsel would have advised the defendant to remain silent. State v. Stoddard,
supra, 206 Conn. 176. Furthermore, the court determined that "because counsel was a member of a firm that had previously represented the defendant, the defendant could reasonably have been expected to respond to counsel's offer of assistance." Id. In State v. Stoddard, then, the trial court was found to have appropriately suppressed statements made by the defendant while his attorney was unsuccessfully attempting to contact him.
Under different circumstances, presented through State v. Cobb,
supra, the Supreme court found that even with an assumed Stoddard
violation, the defendant's waiver of his rights were to counsel and silence were constitutionally valid. State v. Cobb, supra,251 Conn. 356. In Cobb, the court held that the defendant's conduct at the time of his confession and during the preceding week indicated that he would have cooperated with the police interview process, and would voluntarily have provided the inculpatory statements at issue, even if he had been informed that an attorney was attempting to speak with him prior to his confession. Id., 360.
A review of the complex factual basis for the Cobb decision demonstrates its limited intrusion into the Stoddard rule. When the defendant was arrested, a week prior to his confession, he agreed to and did speak with detectives about crimes in that had occurred in Oxford and the crimes that led to his current arrest, which had occurred in Naugatuck. Id. At that time, he signed two separate consent forms, voluntarily permitting the police to search his apartment. Id. At the police station that day, he also willingly provided two written statements about the crimes that had occurred in Oxford and Naugatuck. Id. All of the statements were preceded by numerous Miranda warnings. Id. CT Page 1425-z
While the defendant was transported the next day for arraignment on the Oxford crimes, he was given his Miranda
warnings again, and freely responded to questions about the Naugatuck crimes. Id. After his arraignment for the Oxford crimes, and upon additional Miranda warnings, he also cooperated with regard to the Naugatuck crimes, although he was currently represented by counsel on the Oxford crimes. Id., 361.
Based upon the totality of these circumstances, the court held that "the defendant's conduct during the week before confessing . . . indicates an unmistakable willingness to forgo any reliance on counsel, and to cooperate with the police regarding both those crimes for which he had been charges and those crimes for which he was under investigation." Id., 361-62. The court also noted that at the time of the confession, he was read his Miranda rights twice and read them aloud himself once from the card. Id. 362. Notwithstanding these warnings, the defendant twice stated that he wanted to get the matter "off his chest." Id., 363.
Differentiating the circumstances in Stoddard[5], the Cobb
court noted that a prior relationship had existed between the accused and a partner of the attorney who was attempting to contact him. State v. Cobb, supra, 251 Conn. 363. In Cobb, the attorneys were public defenders, with whom the defendant did not have personal or "firm" relationship. Id. The Cobb court also differentiated its facts from those of Stoddard by noting that in the earlier case, the facts present neither history or suggestion that the defendant wanted to clear his conscience, in contrast to the defendant's seemingly compelling need to speak up and confess, as reflected in the facts of Cobb. Id. While the court in Cobb determined that the state had met its burden of proving, "on the totality of the circumstances, that the defendant would not have acted differently had he been given the proper information", the extraordinary factual basis of that case cannot be mirrored under circumstances which lack evidence of a defendant's full, voluntary, and purgative confession. See Id., 364.
In this matter, the court finds that the facts presented are CT Page 1425-aa far more closely aligned with those of Stoddard than with those of Cobb. Under the totality of the circumstances as demonstrated in this case, the state has not met its burden of proving that the defendant would not have acted differently had he been given the proper information. See State v. Cobb, supra, 251 Conn. 356. Schoenhorn's testimony, credible in and of itself, is also fully consistent with the information presented on the tape recordings made at the Suffield police department on the day in question. In this case, as in Stoddard, Schoenhorn made two calls in which he was given information that was misleading as to the whereabouts of the defendant. On his third call he was not allowed to speak to his client, resulting in further obfuscation of the situation as it actually existed insofar as the provision of counsel was concerned. As with the attorney's inquiries in Stoddard,
Schoenhorn's communications to the Suffield police Schoenhorn's communications were general in nature: he simply asked to speak to the defendant, without divulging factors inherently protected within a nascent attorney-client relationship, nor limiting his inquiries to matters such as provision of assistance with bail.
The existence of a prior attorney-client relationship is one element for the court to consider in assessing the likely effect, if any, that contact with counsel would have had on the defendant's provision of statements to the officers at the Suffield police department. State v. Cobb, supra, 251 Conn. 356. However, the fact that Schoenhorn had no previous relationship with the defendant or any of the defendant's previous attorneys is not dispositive of the question of waiver. Id. The defendant's request to speak with Schoenhorn immediately upon being informed of his presence allows the court to infer that the efforts of counsel would likely have altered the defendant's appraisal and understanding of the circumstances, even though this lawyer had not previously represented the accused. The fact that the defendant intentionally withheld his signature from the Miranda
advisement of rights form, used at the Suffield police department, further demonstrates his unwillingness to waive his rights. Additionally, the terse, generalized responses reportedly provided to Bamford by the accused imply the defendant's hesitancy to become involved in a voluntary exchange of information with the law-enforcement agents at that time: his CT Page 1425-ab specific refusal to divulge Wiegand's phone number is further indication of his apprehension under the circumstances of that interview. From all of these circumstances, the court finds a fair and reasonable basis for concluding that had the Suffield police agents fulfilled their duty to advise the defendant that an attorney was attempting to contact him, indeed, that an attorney wanted to speak to him, James Gordon "Bo" Gritz would have exercised his constitutional right to refrain from providing any voluntary statements at the Suffield police department. Compare State v. Cobb, supra, 251 Conn. 356.
As the state has not met its burden of proving that the defendant waived his constitutional rights to remain silent and to utilize the services of counsel, the defendant's Motion to Suppress Confession, Statements and/or Admissions, dated January 28, 1998, insofar as it related to the defendant's statements made at the Suffield Police Department after 4:00 p.m. on September 30, 1996, is hereby GRANTED.
N. Rubinow, J.