[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTIONS TO SUPPRESS
The Defendant, Sedrick Cobb, has filed motions to suppress all evidence seized from his 1979 Mazda automobile (Amended Motion to Suppress Evidence I, dated 5/7/91): and all evidence seized from his residence at 85 Aetna Street, Naugatuck, Connecticut, (Motion to Suppress Evidence II, dated 3/5/90); and statements made to police officers (Amended Motion to Suppress Statements dated 5/7/91). CT Page 4419
The Court finds the following pertinent cronology of events and facts. On or about June of 1989, Mr. S. Cobb, the defendant in this matter, was arrested in Naugatuck, Connecticut and charged with the crimes of attempted sexual assault, assault and unlawful restraint. That matter is still pending in the Waterbury Superior Court. A public defender was initially appointed on behalf of Mr. Cobb, but subsequently Mr. Cobb retained private counsel, Attorney David Labriola, to represent him in that matter, who still is counsel of record, in that matter.
On December 20, 1989, the defendant was arrested by warrant served on him at his home at 85 Aetna Street, Naugatuck, Connecticut, charging him with the crimes or robbery, burglary and sexual assault in connection with an incident that occurred in Oxford, Connecticut. In connection with that arrest a search and seizure warrant dated 12/20/89 was signed by Judge Sequino, (State's Exhibit 1) which sought to search and seize Mr. Cobb's 1979 Mazda automobile. That warrant was executed and the car was seized and brought to the State Police barracks, Troop A, Southbury, Connecticut, where an inventory was made of the contents of that vehicle. (State's Exhibit 10)
In the early evening of December 20, while police were still at the Cobb apartment, shortly after he had been placed under arrest, the police inquired of Mr. Cobb as to whether he would speak with them concerning the Oxford incident. He agreed, was given his Miranda warning and then voluntarily spoke with the police officers about that incident. At that time he agreed that the State Police and the Naugatuck Police, who were also present at the time of the arrest, and investigating a separate incident that occurred in Naugatuck on or about December 13, could search his apartment and willingly gave to them separate "consents to search" (State's Exhibits 13 15)
Thereafter Mr. Cobb was taken to the Troop A barracks in Southbury where he was booked and again was asked if he would agree to discuss the Oxford incident. He did agree to speak with the police officers and again was advised of his Miranda rights. At that time he willingly gave a written statement relating to the Oxford incident. The police officer who obtained this statement testified that Mr. Cobb was calm and very cooperative. On the same evening, after the State Police concluded their interview with Mr. Cobb, the Naugatuck police who were waiting at the barracks in Southbury were permitted to speak to the defendant. Mr. Cobb consented, was given his Miranda warning and then gave the Naugatuck police a written statement concerning the Naugatuck incident CT Page 4420 of 12/13/89. Officer Hughes of the Naugatuck Police Department described his demeanor as "cool", not upset and very calm.
On the following day, 12/21/89, Detective Byrne of the State Police, transported Mr. Cobb from the Southbury barracks to the Superior Court in Derby where he was to be arraigned in connection with the Oxford incident. On route to Derby, Officer Byrne again, after advising Mr. Cobb of his Miranda rights, asked him whether he was a the Naugatuck Valley Mall on or about 12/16/89 to which he answered in the affirmative.
Mr. Cobb was arraigned at the Derby Court at about 12:00 noon. At that time, Mr. Cobb was advised of his constitutional rights by the presiding judge (State's Exhibit 36) and a public defender Attorney Haselkamp was appointed on his behalf. At 1:00 p. m. on that afternoon (12/21/89) Officers O'Leary and Deely of the Waterbury Police Department went to Derby to speak with Mr. Cobb. Mr. Cobb agreed to speak with them and he again was given his Miranda rights. He freely agreed to cooperate with the police officers and spoke of an incident that occurred on 12/16/89 at the Naugatuck Valley Mall where he stated that he found a Lerners shopping bag in the parking area which he put in his car and a Lerners receipt which he put in his pocket and later left in his bedroom in a box next to his bed. He told the officers at that time that they could go to his apartment to secure the Lerners receipt. The police officers were unwilling to go to his apartment without a "consent to search" which Mr. Cobb agreed to sign. Since the officers did not have a consent form with them they returned to Waterbury to secure one and then returned to Derby arriving back about 4:00 p. m.
Officers O'Leary and Deely presented the consent to search form to Mr. Cobb, Lieutenant Deely advised him of his rights and he indicated that he knew his rights, stating that "The judge just read them to me" and, he signed the consent to search form. (State's Exhibit 17)
The detectives then went to 85 Aetna Street in Naugatuck, and when they looked into the box which was next to his bed, as described by Mr. Cobb, they saw a Watertown Federal Credit Union envelope which they immediately suspected might be evidence in the instant matter because of a previous conversation they had with the victim's boyfriend. The Waterbury officers immediately called State's Attorney John Connelly who advised them to seek a search warrant to secure the Watertown Federal Credit Union envelope. A search warrant was prepared (State's Exhibit 20) which was signed by Judge McDonald to seize the Watertown Federal Credit Union envelope CT Page 4421 and other evidence which the officers felt might be located at the apartment. Later that evening at about 9:00 p. m. on 12/21/89, Officers O'Leary and Deely executed the search warrant (State's Exhibit 20) seized the Watertown Federal Credit Union envelope and other items, including receipts that were found in the Credit Union envelope.
On the following day, 12/22/89, Officer Deely of the Waterbury police and Officer Scannell of the Watertown Police Department sought a search and seizure warrant for Mr. Cobb's 1979 Mazda automobile seeking to seize a red felt, earrings, a Lerners bag and other items that they felt would be evidence in the instant matter and presented the warrant (State's Exhibit 26) to Judge McDonald. Judge McDonald asked them whether Mr. Cobb was involved in any crimes of violence against women. Officer Scannell then added paragraph 14, in his hand, to State's Exhibit 26 stating that the affiants learned that Sedrick Cobb was identified by a female victim in the Oxford incident. Judge McDonald then signed the warrant. (State's Exhibit 26)
The body of Julia Ash, the victim in this case, and her automobile, were found on 12/25/89. Waterbury Police Officers Deely and O'Leary sought another warrant to seize a valve cap and stem cap remover from the Cobb automobile in connection with the instant matter which Judge Byrne signed on 12/26/89. At the same time those same officers sought a seize and seizure warrant to obtain certain items from the apartment of Mr. Cobb which warrant was signed by Judge Byrne. (State's Exhibit 28) on the same date.
On 12/27/89 Mr. Cobb was to be brought to the Waterbury GA #4 Court House located on Kendrick Avenue to be arrested and arraigned in connection with the December Naugatuck incident. On that date, Officers O'Leary and Deely of the Waterbury Police Department went to that court facility prior to 9:00 a.m. to speak with Mr. Cobb. They arrived before Mr. Cobb and when he arrived Officers Deely and O'Leary asked him whether he would speak with them in connection with the instant matter. He agreed and they were permitted to speak with Mr. Cobb privately in the Bail Commissioner's office. They again read to him the Miranda warnings. Officer Deely had Mr. Cobb read from the Miranda "card" out loud and then asked him whether he wanted a lawyer? He indicated that he did not and stated that "He wanted to get this off his chest." He then confessed to the murder of Julia Ash. The previous day, 12/26/89, the public defender at Part A Court at Waterbury, Ms. Sorrentino, also learned that Mr. Cobb was to be arraigned at the GA on Kendrick Avenue. She contacted Mr. Isko, a public defender at the Waterbury GA, either that day or at CT Page 4422 home before Mr. Isko arrived at work on 12/27/89. When Mr. Isko arrived at work on the morning of 12/27/89, prior to 9:00 a.m., he informed Sheriff Michael Connelly that he wanted to speak with the person who was a suspect in a murder case who was to arrive that morning, presumably Mr. Cobb. Sheriff Michael Connelly informed Mr. Isko that he would have to check with the captain. Mr. Isko then testified that he had talked with Lieutenant Calo who assured him that he would advise him when that gentleman arrived. In the interim, prior to 9:00 a.m., Ms. Sorrentino went over to the GA on Kendrick Avenue and met with Mr. Isko on or prior to 9:00 a.m. so that she could accompany Mr. Isko when they spoke with Mr. Cobb. Mr. Isko was busy with other matters and when he became free sometime on or after 9:00 a.m. they both went down to the lockup where they discovered Mr. Cobb in conference with Officers O'Leary and Deely. There was some testimony as to whether Sheriff Connelly, who was stationed outside of the Bail Commissioner's office, prevented Attorneys Sorrentino and Isko from entering the room but in fact, the attorneys entered the room immediately when they discovered that he was present in the Bail Commissioner's office. At the time that they entered, Officers O'Leary and Deely were about to obtain a written confession from Mr. Cobb, but at that point Attorneys Sorrentino and Isko asked the police officers to leave which they willingly did.
The defendant seeks to suppress all evidence seized as a result of the "consent to a search", the search warrants of the apartment and automobile and the statements obtained by the police officers.
I. AMENDED MOTION TO SUPPRESS EVIDENCE (I) 5/7/91
The Court will first consider the defendant's motion to suppress the evidence seized from the defendant's 1979 Mazda automobile pursuant to the various search warrants.
A. The Inventory Search (State's Exhibit 10) — made pursuant to warrant (State's Exhibit 1)
The defendant does not question the legality of the seizure made pursuant to the warrant executed on 12/20/89 (State's Exhibit 1). The defendant claims, however, that the inventory made pursuant to that search (State's Exhibit 10) was invalid. Trooper Froelich stated that it was a policy of the State Police to take inventory searches of all automobiles legitimately in police custody. He testified that inventory was done to protect the items in the automobile, to protect the State from claims concerning missing items and to determine and seek any dangerous items CT Page 4423 located in the automobile. It is well established that the taking of such an inventory is a well-recognized exception to the warrant requirement, State v. Gasparro, 194 Conn. 96,107 (1984). The Court finds that the inventory search was proper, that it was not conducted to secure evidence, but merely to conform to State Police policy and for the reasons stated by Officer Froelich and therefore constituted a valid and lawful search.
B. The Validity of Subsequent Searches (State's Exhibits 20 26) Based on The Inventory Search
Having found the inventory search to be valid, the Court will reject the defendant's argument that the product or fruits of the search should be suppressed and consequently the warrants of 12/21/89 and 12/22/89 (State's Exhibits 20 26).
C. The Validity of Search Warranted dated 12/22/89 (State's Exhibit 26)
The defendant claims that the warrant of 12/22/26 (State's Exhibit 26) seeking to seize items in the defendant's 1979 Mazda was invalid because the allegations contained in paragraph 14 contained false information. As stated above, Officer Scannell testified that when he presented the warrant to Judge McDonald, he was asked by the Judge whether Mr. Cobb was ever involved in a sexual assault. Based upon that inquiry Officer Scannell added paragraph 14 which stated that the defendant was identified by a female victim as the man who sexually assaulted her. Although there is no question that the victim in the Oxford case did not positively identify Mr. Cobb as her assailant she did nonetheless pick out Mr. Cobb from a photo array as a person who resembled the defendant. Officer Scannell did not represent that the victim positively identified him and could have been more precise about the identification. However, the Court finds that Officer Scannell did not intend to mislead nor was the information "false information" or made with reckless disregard for the truth, which is the test to invalidate it under Franks v. Delaware, 438 U.S. 154, 98 Ct. 2674 (1978) and State v. Delmonico, 194 Conn. 331 (1984). In addition the Court finds that the remaining paragraphs of the affidavit independently would establish probable cause.
For the reasons stated above the Court finds that the warrant of 12/22/89 (State's Exhibit 26) was valid.
D. The Validity of the Search Warrant Dated 12/26/89, (State's Exhibit 26)
The defendant argues that since the search warrant of CT Page 4424 12/26/89 contained allegations based on the inventory illegally obtained pursuant to the search of 12/20/89 (State's Exhibit 1) that the Court should suppress the evidence obtained in that search. The Court has ruled that the inventory taken pursuant to the search of 12/20/89 (State's Exhibit 1) was valid and therefore defendant's argument in connection with the invalidity of the 12/26/89 warrant (State's Exhibit 27) must fail.
For reasons stated above the Court denies the defendant's Amended Motion to Suppress Evidence (I), dated 5/7/91.
II. MOTION TO SUPPRESS EVIDENCE (II) 3-5-90
Defendant in this motion seeks to suppress all evidence seized as a result of the searches at Mr. Cobb's residence at 85 Aetna Street, Naugatuck, Connecticut. The Court is asked to consider the validity of three searches: the consent to search (State's exhibit 17); the search warrant dated 12/21/89 (State's Exhibit 20); and the search warrant dated 12/2/89 (State's Exhibit 28).
A. CONSENT TO SEARCH (STATE'S EXHIBIT 17)
The defendant attacks the validity of Mr. Cobb's consent to search his home given on 12/21/89 at the Derby courthouse. The Court must determine whether Mr. Cobb did in fact waive his Fourth Amendment protection by voluntarily consenting to a search without a warrant. Whether his consent was voluntary is a question of fact to be determined by the totality of the circumstances. State v. Torres, 197 Conn. 620. The Court accepts the testimony of the police officers that in fact Mr. Cobb was given his Miranda warning prior to his consenting to this search. The Court finds that Mr. Cobb was well-advised of his constitutional rights. As indicated, he was not a novice to the criminal justice system. On the previous day, after he was arrested for the Oxford incident at his home, he voluntarily agreed to a similar consent to search after he was read his Miranda rights. That very evening he voluntarily gave two written statements in connection with the Oxford and Naugatuck incidents which both occurred in December of 1989 and police officers testified he was given his Miranda warning in both instances. That very day, 12/21/89, at his arraignment he was informed of his constitutional rights at or about 12:00 p. m. by the presiding Judge in Derby and an attorney was appointed on his behalf. The police officers testified that when they initially spoke with Mr. Cobb at or about 1:00 p. m., he in fact suggested that they go to his apartment to secure the Lerner receipt. The police officers told him at that time that they did not have the proper consent form but that they would return to have him execute it. CT Page 4425 They did not return until some time after 4:00 p. m. so that Mr. Cobb had sufficient time to consider whether he should or should not agree to sign the consent form. The police officers testified that he willingly signed the consent form after he again was given his Miranda warnings. Because of the totality of the circumstances the Court finds that consent to search was freely and voluntarily given by Mr. Cobb on 12/21/89. Additionally, the defendant argues that a consent to search was "involuntary" because it was in the absence of his attorney. The defendant concedes there is no prohibition against interrogating a suspect in an unrelated matter. The defendant's argument is that the interrogation of Mr. Cobb at that time in the absence of an attorney appointed in an unrelated matter should be considered by the Court in the totality of circumstances. As conceded by the defendant, defendant's right to counsel attaches only after the initiation of an adversary judicial criminal proceedings. State v. Palmer, 206 Conn. 40, 64. At the time this consent was signed, Mr. Cobb was merely a suspect in the instant case. The fact that he was in custody for an unrelated matter did not in any way affect his right to counsel in connection with the matter that was then under investigation. State v. Palmer, supra. 64. The Court finds that from the totality of the circumstances that Mr. Cobb's consent to search was made voluntarily and freely.
 B. SEARCH OF RESIDENCE 12/21/90 — 9:00 P.M. STATE'S EXHIBIT 20
It is the defendant's position that the warrant obtained subsequent to the consent to search, the warrant dated 12/21/89 (State's Exhibit 20) was obtained as a direct result of the "illegal search" conducted earlier that day pursuant to the "consent to search." (State's Exhibit 17) Having found that the consent to search was legal and valid the Court will not consider the defendant's argument that the warrant of 12/21/89 to search the defendant's apartment, (State's Exhibit 20) based on the "consent to search" (State's Exhibit 17) In addition the defendant raises a "four-corners argument" in connection with the 12/21/89 warrant (State's Exhibit 20). The Court finds from the review of the warrant (State's Exhibit 20) that there was probable cause that the magistrate executing the warrant had a basis for concluding that the search would uncover evidence of wrong-doing and that it would probably be on the premises sought to be searched. In addition, this Court gives great deference to the fact that the issuing magistrate did in fact find probable cause. State v. Couture,194 Conn. 530, 536 (1984). The police officer had already seen the Watertown Federal Credit Union envelope at the defendant's apartment, this coupled with the statement of the CT Page 4426 victim's boyfriend that the victim probably had a Watertown Federal Credit Union envelope in her possession at the time of her disappearance was certainly sufficient cause for the magistrate to execute the warrant dated 12/21/89 (State's Exhibit 20).
The defendant further argues that the receipts found in the Watertown Federal Credit Union envelope should be suppressed in that they were not specifically sought by virtue of the warrant (State's Exhibit 20). The Court rejects the defendant's claim, in that the receipts can be considered a part and parcel of the envelope and in addition the warrant does seek to seize "receipts."
 C. SEARCH OF RESIDENTS PURSUANT TO WARRANT OF 12/26/89 (STATE'S EXHIBIT 28)
The defendant argues that the warrant of 12/26/89 seeking again to obtain evidence at Mr. Cobb's apartment, was illegal because it was based on information obtained in prior searches that were illegal. Again, the Court has found that the prior searches were legal and consequently will dismiss the defendant's claim on those grounds.
In addition, the defendant argues that the "apartment" warrant of 12/26/89 (State's Exhibit 28), should be suppressed because of the insufficiently of the affidavit accompanying the warrant. Again the Court is guided by the presumption for preference for warrants and the presumption of validity and the deference given to a magistrate's determination of probable cause. Illinois v. Gates, 462 W.S. 213 (1983); United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983). The Court finds with regards to the 12/26/89 warrant (State's Exhibit 28), that in fact there was reason to believe that because there were papers missing from Julia Ashe's wallet, when the wallet was discovered inside her vehicle on 12/25/89, that those missing papers might be located at Mr. Cobb's apartment where other evidence of the instant crime was already discovered. The Court therefore finds that probable cause did exist, State v. Brown,14 Conn. 605, 615. In addition the Court dismissed the defendant's argument that prior searches failed to uncover the particular items sought to be seized in this warrant (State's Exhibit 28) and therefore there was not probable cause to believe that they would be located at the apartment. In conducting the previous searches, the police officers may have concluded their search when they found the items they were looking for or they may just have overlooked these items. In any event the Court finds that in fact there was probable cause sufficient to believe that those items would be located CT Page 4427 at the Cobb apartment, and therefore finds the warrant of 12/26/89 (State's Exhibit 28) to be valid.
For all of the reasons stated above, the Court will deny the defendant's Motion to Suppress Evidence (II) dated 3/5/90.
 III. DEFENDANT'S AMENDED MOTION TO SUPPRESS STATEMENTS — 5/7/91
The defendant filed this motion seeking to suppress statements alleged to have been made by Mr. Cobb on 12/21/89 and 12/27/89.
Although the defendant in his motion seeks to suppress the statement alleged to have been made on route to the Derby Court on the morning of 12/21/89, the state has indicated that it does not intend to use the statement in its case in chief and consequently it may be necessary for the Court to rule on this claim of the defendant. The defendant argues, however, that even if the statement itself will not be used in the state's case in chief, the information derived from the defendant may have been used in subsequent interrogations and therefore it should be suppressed. The Court finds, again, that based on the experience of Mr. Cobb with the court system dating from June of 1989, that he certainly was not a novice to the criminal justice system. In addition, he made voluntary statements the previous evening after having his Miranda rights explained to him on several occasions. In addition, at the time he was arrested, he voluntarily spoke with a police officer and agreed to a search of his apartment after he was given his Miranda warnings. The police officers testified that his conduct on route to Waterbury was calm, that he certainly seemed to know exactly what he was doing, and that he understood his rights, and therefore, the Court finds under those circumstances this statement was given voluntarily by Mr. Cobb. State v. Mercer, 208 Conn. 52, 70.
The next statement that defendant seeks to suppress was the statement made at the Derby courthouse to the Waterbury Detectives Deely and O'Leary on 12/21/89 at approximately 1:00 p. m. after Mr. Cobb was arraigned in connection with the Oxford incident. For the reasons stated above,[1] the Court believes that the statement made by Mr. Cobb was voluntary.
The defendant's final argument in connection with the oral "confession" which was allegedly made to Officers Deely and O'Leary on 12/27/89 at the Superior Court GA 4 in Waterbury. The defendant relies on State v. Stoddard, 206 Conn. 157
(1988) in its argument that Attorneys Sorrentino and Isko's efforts to render legal assistance were made on behalf of Mr. CT Page 4428 Cobb and that there was a duty to inform Mr. Cobb of their efforts all of which violated his due process rights. The state on the other hand disputes that the ruling of Stoddard is applicable in the instant matter because of the significant factual differences that distinguish the instant matter from Stoddard. The Court agrees that the cases are clearly distinguished on their facts. In Stoddard, the defendant was in the custody of the police for a period of well over twenty-four hours from about 1:15 p. m. to the following day at 3:00 p. m. In the Stoddard case, shortly after the defendant was arrested, prior to 2:00 p. m. on the first day, his girlfriend called his attorney who had represented him on prior charges. That attorney's partner called the Bridgeport Police Station, where the accused was being held and requested to speak with his client. He was told that his client was not present. That attorney made a total of three calls to the Police Department on that day and each time the police denied that the defendant was on the premises. On the following day his attorney again made an unsuccessful attempt to contact his client at the Bridgeport Police Station. Contrasted with Stoddard, the facts in the instant matter are substantially different. The defendant concedes in this matter that the request of Attorneys Sorrentino and Isko were not made to the police, but to the Sheriff's Department. In addition, Mr. Cobb could not have been at the Waterbury GA courthouse more than ninety minutes before Attorneys Sorrentino and Isko spoke with him. There is no question, and the defendant concedes that neither Mr. Cobb and/or any representative or family member ever requested the public defender's office in Waterbury to represent him or to act on his behalf. On that date in a pending matter in Waterbury he was represented by a private attorney, Attorney Labriola, so that the defendant cannot claim that because their office represented him in a matter in Derby that they were the only "law firm" that represented him at that time. In addition, it is undisputed that the requests of Attorneys Sorrentino and Isko were made of the Sheriff's Department and not the Police Department who sought to interrogate him. As our Supreme Court had held in State v. Whittaker, 215 Conn. 739, "Stoddard prohibited only "police interference in the attorney-client relationship" p. 752 and therefore refused to extend the holding of Stoddard to situation involving a mother attempting to intervene on behalf of her juvenile son. This Court is unable to extend the rule of Stoddard to the instant situation. This case does not deal with police interference in an attorney-client relationship. Attorneys Sorrentino and Isko were not Mr. Cobb's attorneys nor did the Police Department in any way interfere with them in their attempt to represent Mr. Cobb. Again, the rule of Stoddard" imposes a duty on police officers (emphasis added) who are holding a suspect for custodial CT Page 4429 interrogation to act reasonably, diligently and promptly to appraise the suspect of efforts by counsel to provide pertinent and timely legal assistance." Stoddard, supra at 163.
Even if this duty should be extended to the Sheriff's Department, which the Court is not prepared to concede and could not find from the evidence presented that the Sheriff's Department stood in the shoes of the Police Department, this Court finds that, from the totality of circumstances, even if they had a duty to inform the defendant and did not, that the defendant would have consented to speak with the police officers. As this Court has found, Mr. Cobb, on the morning of 12/27/89 did not seek or attempt to seek legal assistance, nor did anyone on his behalf seek the services of the public defender. Based on the testimony of Officers Deely and McNally, who stated that Mr. Cobb was very willing to speak with them and indicated that he "wanted to get it off his chest", the Court finds that there is a reasonable likelihood that the defendant would have still voluntarily spoken with the police officers. In addition, based on the actions of Mr. Cobb from 12/20/89 to that date, the Court finds that Mr. Cobb was well aware of his constitutional rights, his right to an attorney and voluntarily waived those rights on numerous occasions before 12/27/89 and in all likelihood would have waived his rights even with the knowledge that a public defender wanted to speak with him on the morning of 12/27/90.
In addition, the holding of Stoddard indicates that the request of counsel must be reasonably diligent and timely. The Court finds that the public defender's office had the same knowledge that the Waterbury detectives had in connection with Mr. Cobb's court date in Waterbury on 12/27/89. That Ms. Sorrentino certainly could have gone directly to the lockup area as did the Waterbury police in order to advise Mr. Cobb as she intended. There was no credible evidence that the Sheriff's Department at any time prevented the public defenders from entering the lockup area at the Waterbury GA. There was no evidence presented that public defenders were not allowed and not given free access to the lockup area at the GA in Waterbury. The Court finds that the public defender's office was not as diligent in this matter and that they could have either notified the Waterbury police directly as Ms. Sorrentino could have done the previous day, or arrived at the lockup area prior to Mr. Cobb's arrival. The Court finds on 12/27/89 Mr. Cobb was given his Miranda warning that in accordance with the testimony of Officer O'Leary, Mr. Cobb seemed to understand his constitutional right and because of the reason stated above regarding the totality of circumstances, the Court CT Page 4430 finds that the statement given to the police officers on 12/27/89 was voluntary. For the reasons stated above, the Court will deny the defendant's Motion to Suppress Statements as requested in his motion of 5/7/91.
JOSEPH H. PELLEGRINO, JUDGE